# Applicability of Executive Privilege to Independent Regulatory Agencies

A case cannot be made for absolute exclusion of the so-called independent regulatory agencies from the doctrine of executive privilege.

Although free from executive control in the exercise of quasi-legislative and quasi-judicial functions, independent regulatory agencies frequently exercise important functions executive in nature.

As to the latter functions, the doctrine of executive privilege is as much applicable to regulatory commissions as to the executive departments and officers of the government.

November 5, 1957

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This is with reference to your memorandum of June 29, 1957, concerning the question raised by Senator Saltonstall in connection with the recent hearings on the nomination of J. Sinclair Armstrong as Assistant Secretary of the Navy as to the applicability of the doctrine of executive privilege to members of "independent" regulatory agencies, such as the Securities and Exchange Commission ("SEC"). In this regard you have asked us to review Mr. Armstrong's testimony and the earlier memorandum[*] originating from this Office which deals with the question. We have proceeded on the assumption, which you have asked us to make, that the President has authorized assertion of the privilege with respect to a demand for disclosure by a committee of Congress.

## I. Summary

Because the subject is not only important and controversial but also obscure it has been necessary to canvass and discuss a considerable amount of material. This discussion is set out in detail below. Because of its length we have deemed it helpful to precede the discussion with the following summary:

The issue in the hearing on Mr. Armstrong's nomination was whether Mr. Armstrong as chairman of the SEC had properly asserted in 1955 the right to withhold from an investigating committee of the Senate communications between himself and the Assistant to the President, Governor Adams, concerning a proceeding before the SEC for the approval of the financing of the Dixon-Yates contract. Mr. Armstrong took that position upon the basis of the President's letter of May 17, 1954, to the Secretary of Defense advising him that the public interest required that, in testifying before congressional committees, employees of the

---

[*] Editor's Note: The referenced memorandum is understood to be *Assertion of Executive Privilege by the Chairman of the Atomic Energy Commission*, 1 Op. O.L.C. Supp. 468 (Jan. 5, 1956), included later in this volume and discussed in the body of this memorandum opinion at page 180.

Executive Branch must not disclose their internal communications. Finally, upon written advice from the Attorney General, Mr. Armstrong disclosed the substance of the communications. The Attorney General stated that the directive of the President was inapplicable to a quasi-judicial proceeding such as was involved before the SEC. He assumed, however, that the President's directive extended to the internal affairs of the SEC and to communications between the SEC and the Executive Branch regarding administrative matters.

At the hearing on Mr. Armstrong's nomination one Senator (Senator Russell) went so far as to question whether the SEC as an independent agency had any right even to consult the Attorney General on such matters. Senator Saltonstall said he would not attempt to pass on the question.

In our earlier memorandum, which dealt with the assertion of privilege by Admiral Strauss as chairman of the Atomic Energy Commission ("AEC") with respect to conversations with the White House concerning the repudiation of the Dixon-Yates contract, the position was taken that the President's letter was applicable, whether or not the AEC as a technical matter was part of the executive branch, since in the Dixon-Yates matter the AEC was exercising an executive function.

Some of the so-called independent regulatory commissions appear to take the view that whether or not the doctrine of executive privilege applies in their case depends upon the nature of the function involved. They assert that they are entitled to invoke the privilege where the communication relates to their executive or administrative functions but not if it involves their quasi-legislative or quasi-judicial functions. Other agencies, such as the Federal Trade Commission and the Interstate Commerce Commission, take the position, without attempting to differentiate between their functions, that as "arms of Congress" they are not bound by any doctrine of executive privilege.

Some legislative analysts of the problem, denying that the Executive Branch can itself properly assert the privilege, state that *a fortiori* an independent regulatory body cannot assert it. But apart from this broad proposition, they argue more narrowly that such bodies, in the information phases of their activities, are wholly independent from direction by the Executive Branch, and apparently they make no differentiation on the basis of whether the information relates to executive, quasi-legislative, or quasi-judicial functions.

No federal court has passed upon the precise question here involved. The decision which most nearly bears on the question is *Humphrey's Executor v. United States*, 295 U.S. 602, decided in 1935. Those who deny the applicability of the doctrine of executive privilege to the so-called independent regulatory agencies place great reliance on *Humphrey's Executor*. In that case the Supreme Court held that the independent status of the Federal Trade Commission prevented the President from removing its members within his uncontrolled discretion. But we think the case cannot be invoked as a complete charter of independence of the

regulatory commissions from executive control. The Court itself noted one exception, namely, that the President was vested with the power to select its members. Accordingly, even under *Humphrey's Executor* we believe that the doctrine of executive privilege could be properly asserted, for example, as to conversations between the President and members of an independent regulatory agency concerning the appointment of members. Moreover, where the agency has important executive functions it is our view that *Humphrey's Executor* cannot be cited to deny the existence of executive privilege at least where it relates to the exercise of such functions. In some areas Congress has itself subjected the independent regulatory commissions to executive control. For example, the President has been authorized to apply the federal employee's security program to all departments and agencies of the government. This includes the regulatory commissions. Hence, it is our opinion that they are also subject to the requirements of secrecy governing employee security matters. The President's power to remove commission members for inefficiency, neglect of duty, or malfeasance (Federal Trade Commission, Interstate Commerce Commission, Atomic Energy Commission, Civil Aeronautics Board) implies that he may exercise a certain amount of managerial authority over the commission. It would seem to follow that in this area the commission would be obligated to respect the President's wishes as to the release of communications between the commission and the President of his staff. That the independent regulatory commissions are not entirely divorced from the Executive Branch is further supported by the established practice which regards them as entitled to obtain formal legal advice from the Attorney General.

While the question of executive privilege has been the subject of considerable professional comment, no one has centered upon application of the privilege to the independent regulatory commission. The most comprehensive study and analysis of the relationship between the independent regulatory agencies and the President is that made by Professor Robert E. Cushman in *The Independent Regulatory Commissions*, published in 1941. The conclusions reached by Professor Cushman support those reached by us above.

We conclude in short that no valid case can be stated for excluding absolutely the so-called independent regulatory agencies from the doctrine of executive privilege. In many respects their functions and operations are subject to executive control. In such cases the doctrine of executive privilege should apply to the independent regulatory commissions to the same extent that it applies to the executive departments and officers of the federal government.

## II. The Armstrong Testimony

On May 14, 1957, a hearing was held before the Senate Committee on Armed Services on the nomination of J. Sinclair Armstrong to be an Assistant Secretary of the Navy. Mr. Armstrong was interrogated by Senator Kefauver concerning his testimony in 1955 before the Subcommittee of the Senate Judiciary Committee on

Antitrust and Monopoly regarding certain aspects of the Dixon-Yates contract. *Nomination of J. Sinclair Armstrong to Be Assistant Secretary of the Navy: Hearing Before the S. Comm. on Armed Services*, 85th Cong. 6–36 (1957) ("1957 Hearing"). Senator Kefauver stated that on the basis of Mr. Armstrong's conduct at that time he would have to oppose Mr. Armstrong's nomination:

> The grounds on which I oppose Mr. Armstrong's confirmation arise out of his handling of certain important aspects of the Dixon-Yates case, in his role as Chairman of the Securities and Exchange Commission.

*Id.* at 6–7.

### A. Armstrong's Testimony Before the Senate Subcommittee on Antitrust and Monopoly

In 1955 the Subcommittee on Antitrust and Monopoly initiated an investigation of the role of the First Boston Corporation, through one of its officers, Adolphe H. Wenzell, in the negotiations leading up to the Dixon-Yates contract. Mr. Wenzell had been retained by the Bureau of the Budget as a consultant in connection with certain features of the contract; it was claimed that there might be a possible conflict of interest arising from Wenzell's position with the First Boston Corporation.

At this time Armstrong was Chairman of the Securities and Exchange Commission, before which were pending applications of the Dixon-Yates companies for approval of their proposed financing of the contract project. On June 27, 1955, Senator Kefauver, who was a member of the subcommittee, wrote Mr. Armstrong inquiring as to the reasons for postponement of the hearings on the applications:

> On Monday, June 13, representatives of the First Boston Corp. and Adolphe H. Wenzell, formerly a vice president of the corporation, were scheduled to testify before the SEC in connection with the financing plans of the Mississippi Valley Generating Co., better known as the Dixon-Yates contract.
>
> Without notice or explanation the Commission directed the trial examiner to suspend the taking of testimony. The hearings were later resumed on Thursday, June 16, still with no explanation as to the reason for the cancellation.
>
> I should like to inquire from you whether any request or representation was made to the Commission with respect to the suspension of the hearings. I should also like to inquire whether any representation was made to the Commission by any official or representative of the

Government asking that the hearing scheduled for June 13 can be canceled, or whether such cancellation was discussed by the Commission with any officials or representatives of any other branch of the Government.

*Quoted in Power Policy—Dixon-Yates Contract: Hearings Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 84th Cong., pt. 1, at 326 (1956) ("1955 Hearing"). On July 11, 1955, Mr. Armstrong advised Senator Kefauver that the SEC could not supply such information because, the application still being before the Commission, "we do not believe that it would be consistent with the orderly conduct of the administrative processes of this agency to subject to concurrent congressional review the manner in which this Commission is discharging its quasi-judicial functions in this proceeding"; and "this Commission is bound to respect the privileged and confidential nature of communications within the executive branch of the Government on the principles as set forth in the President's letter of May 17, 1954, to the Secretary of Defense." *Quoted in id.* at 327.[1]

Following the cancellation of the Dixon-Yates contract by the President, the proceedings before the SEC lapsed. Mr. Armstrong appeared before the subcommittee on July 12, 1955. He declined, however, to disclose any conversations he might have had with other officials in the executive branch concerning the postponement, stating that he was forbidden by the President's letter of May 17, 1954, to make such disclosure. *Id.* at 330–34.[2] When Senator Kefauver pointed out

---

[1] The President in this letter, referring to an attached memorandum of the Attorney General, stated that "throughout our history the President has withheld information whenever he found that what was sought was confidential or its disclosure would be incompatible with the public interest or jeopardize the safety of the Nation." 100 Cong. Rec. 6621 (1954); Letter to the Secretary of Defense Directing Him to Withhold Certain Information from the Senate Committee on Government Operations, *Pub. Papers of Pres. Dwight D. Eisenhower* 483, 483 (May 17, 1954). And, the President continued,

> Because it is essential to efficient and effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications, or any documents or reproductions, concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions. This principle must be maintained regardless of who would be benefited by such disclosures.
>
> I direct this action so as to maintain the proper separation of powers between the Executive and Legislative Branches of the Government in accordance with my responsibilities and duties under the Constitution. This separation is vital to preclude the exercise of arbitrary power by any branch of the Government.

*Id.* [Editor's Note: *See also* 100 Cong. Rec. 6621–23 (memorandum of Attorney General).]

[2] Mr. Armstrong declined to answer, among others, the following question put by Senator Kefauver:

that the President's letter was directed to the Secretary of Defense, the head of an executive department, whereas the SEC was "a quasi-judicial agency" and "we are inquiring about . . . alleged interference, with the judicial work of the Securities and Exchange Commission," Mr. Armstrong responded that the President's letter applied to administrative functions of the Commission, which included the scheduling of hearings. *Id*. at 342.

Thereafter, the Attorney General advised Mr. Armstrong in response to the latter's request as follows:

> With regard to your statement that the Commission is bound to respect the privileged and confidential nature of communications within the executive branch of the Government on the principles as set forth in the President's letter of May 17, 1954, to the Secretary of Defense, I concur. Any communication within the Securities and Exchange Commission among Commissioners or the Commissioners and employees is privileged and need not be disclosed outside of the agency. Likewise, any communication from others in the executive branch to members of the Commission or its employees with respect to administrative matters comes within the purview of the President's letter of May 17, 1954.

> You inquired specifically whether when a proceeding is pending before the Commission a request to the Commission for an adjournment by someone in the executive branch outside the Commission is likewise covered. Because such a proceeding is quasi-judicial in nature, it is my opinion that such a request would not be covered by the President's letter of May 17, 1954, and once the proceeding is no longer pending before the Commission such information should, upon request, be made available by the Commission to an appropriate congressional committee.

*Id*. at 379 (quoting letter of Attorney General dated July 12, 1955). Thereupon Mr. Armstrong revealed that the request for adjournment came from Governor Adams,

---

> [D]id you receive any communication or did you talk with anyone in the White House, Mr. Hughes, Mr. Dodge, Mr. Sherman Adams, or Mr. Bernard Shanley, Mr. Brownell, or anyone else, first advising you that a vote was coming up in the House, a big administration matter in a close vote, that this testimony might affect what was going to go on the Hill?
>
> That is all I am asking, just whether there was any interference with the hearing or not.

*Id.* at 336. There was pending before the House a bill providing for a $6,500,000 appropriation to construct a transmission line between the proposed Dixon-Yates plant and the existing TVA power lines. *Id.* at 417–22.

Assistant to the President, in the form of a telephone call on Saturday, June 11. *Id.* Mr. Adams stated that the reason for the request was to permit "certain Government attorneys" who were out of the city to determine whether they should object to the testimony of Mr. Wenzell. *Id.* at 380. Armstrong testified that upon informing the Commission of Governor Adams' request the Commission voted to continue the hearings. *Id.* He further testified that on June 15, 1955, Governor Adams advised him that "the Government attorneys" had decided not to participate, and that upon so informing the Commission it directed the hearings to resume. *Id.*

In the interrogation of Mr. Armstrong concerning the meaning of the Attorney General's letter, both Senators Kefauver and O'Mahoney agreed that a privilege existed as to communications within a Commission by members of the Commission with the employees. *Id.* at 383–84, 387–88. However, Mr. Armstrong, on the basis of the President's letter of May 17, 1954, refused to state whether or not his conversation with Governor Adams covered the bill pending before the House:

> [T]he question that you ask . . . has to do with a legislative matter in Congress and nothing to do with the pending proceeding before the Securities and Exchange Commission. . . . I am relying on the opinion of the Attorney General.

*Id*. at 419–20. The subcommittee (Senators Kefauver, O'Mahoney, and Langer) then asked Mr. Armstrong to obtain an opinion from the Attorney General as to whether the SEC would be permitted to make

> a full, detailed, and complete disclosure of all meetings, all conferences, all conversations, no matter where or when they took place, so long as they relate to the Dixon-Yates deal, and are outside of the purely administrative or housekeeping duties of the Commission as defined, and in purview of the Reorganization Act.
>
> This is the information we want and this is the clearance we hope Mr. Armstrong will obtain from the Attorney General.
>
> The investigation being conducted by this committee goes to the question of outside influence or alleged corruption in the Dixon-Yates deal. This committee wants to find out how far this outside influence or corruption went, what agencies of the Government were involved, and what influence or pressure, if any, was brought to bear on a quasi-judicial agency with statutory responsibilities under the Public Utility Holding Company Act.
>
> In these circumstances, there can be no privilege in the judicial proceedings. . . .

*Id*. at 429.[3]

At this point the hearing was adjourned to permit Mr. Armstrong to consult the Attorney General. He did so[4] and, upon resumption of the hearing on July 20, 1955, he testified that he was prepared to testify concerning the above matters: "Everything that I know about, I am prepared to testify to in that regard." *Id*. at 624. He then revealed that Governor Adams in connection with the request for a continuance of the SEC hearing had mentioned the pending appropriation bill, to which he replied: "Well, I don't know anything about that. It doesn't concern the Commission." *Id.* at 625. Governor Adams said: "That's right," and, according to Mr. Armstrong, "[t]hat is all there was to it," except that "[i]t is my best recollection today that the Government lawyers that Governor Adams was referring to in the part of the conversation I testified to the other day were the Attorney General, Mr. Brownell, and the special counsel for the President, Mr. Morgan." *Id.* Governor Adams said "he wanted these lawyers to consider the problem [of Wenzell's testimony], and they were away, and he couldn't get hold of them." *Id.* at 628.[5]

Mr. Armstrong refused, however, to state whether or not he had talked to Governor Adams about the matter since he had been summoned to testify at the hearing; he asserted that any such conversation was privileged under the President's letter to the Secretary of Defense. *Id.* at 634–35. On July 21, 1955, Governor Adams declined the subcommittee's invitation to testify, stating:

> Since every fact as to which I might give testimony either has been or could be testified to fully by other responsible Government offi-

---

[3] The Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203, directs the President to examine the organization "of all agencies of the Government" to determine the changes necessary to accomplish more effective management, *id.* § 2(a)(1) (codified at 5 U.S.C. § 133z(a)(1) (1952)), and for that purpose to prepare and submit plans of reorganization of any agency to the Congress, *id.* § 3 (5 U.S.C. § 133z-1). Section 7 of the Act defines the term "agency" to mean "any executive department, commission, council, independent establishment, Government corporation, board, bureau, division, service, office, officer, authority, administration, or other establishment, in the executive branch of the Government." 5 U.S.C. § 133z-5. Reorganization Plan 10 of 1950 transferred the executive and administrative functions of the SEC from the Commission to its Chairman. 15 Fed. Reg. 3175.

[4] Our files contain a copy of a letter from the Attorney General to Mr. Armstrong dated July 19, 1955, stating:

> As I view the matter, there is no bar by reason of the President's letter to the Secretary of Defense, or the principles involved, to disclosure of the entire conversation with Governor Adams, part of which related to his request for a short postponement of the Commission hearing in the Dixon-Yates proceedings.

[5] The Department's files (No. 115-016, § 3) disclose a letter from Senator O'Mahoney to the Attorney General dated February 20, 1956, asking whether Governor Adams had discussed the matter with the Attorney General. The letter replied under date of February 27, 1956, that the Attorney General had not had any such conversation.

cials, and because of my official and confidential relationship to the President, I respectfully decline the subcommittee's invitation.

*Id.*, pt. 2, at 676 (quoting letter). Thereafter, Mr. Armstrong testified that Mr. Morgan had informed him that the Attorney General had advised Mr. Morgan that while Mr. Armstrong was free to state that he had talked to Governor Adams since being summoned as a witness,[6] the conversation itself was privileged under the President's letter of May 17, 1954. *Id.* at 751.

## B. Armstrong's Testimony at the Hearing on His Nomination

Senator Kefauver, reviewing Mr. Armstrong's testimony before the Antitrust and Monopoly Subcommittee, summarized his objection to Mr. Armstrong's confirmation as follows:

> [M]y point is that Mr. Armstrong did not live up to his trust in allowing Sherman Adams or somebody else to have him postpone a hearing without notice, without giving reasons; and he did not live up to his trust in allowing the SEC to be used, keeping information from getting to the House of Representatives which would affect legislation there, which they had a right to know.
>
> And, after having told our committee on three occasions that he had told the whole story, he came back and told more and more of it and then finally, in the end, pleaded executive privilege all over again. That is the story.
>
> I think it should be borne in mind that the Securities and Exchange Commission is a creature of Congress, it is a quasi-judicial agency. And my feeling is that anyone who would allow this procedure, and then refused to testify and pleaded executive privilege, and not telling about it, to say that he told the story, and then every time it develops that he had not told the full facts, simply is not worthy to be confirmed to this high office.

1957 Hearing at 13.

Mr. Armstrong defended his presentation of Governor Adams' request for a postponement of the SEC hearings to the Commission, and stated that he had withheld no information from the Antitrust and Monopoly Subcommittee with the exception of the single conversation with Governor Adams occurring after the subcommittee's hearing had begun. *Id.* at 18. He also defended the Commission's failure to advise the parties to the SEC proceeding of the reason for the postpone-

---

[6] It appears that Governor Adams had telephoned Armstrong. *Id.* at 756.

ment, "[b]ecause the request had come from a person with respect to whom the executive privilege pertained." *Id*. at 22.

Senator Russell, chairman of the committee considering the nomination, stated that he had some question "as to whether an independent agency of the Government ought to consult with the Attorney General as to what is and what is not a proper matter of Executive privilege," *id.* at 34, and "I can conceive of cases where requests which are highly improper might be made from within the personnel of the White House to one in charge of an executive agency of Government, and I do not think that the opinion of the Attorney General in a case of that kind ought to bind one who has the responsibilities in connection with an independent agency which would preclude him from divulging those facts, either to a congressional committee or to a grand jury," *id*. at 35.

Subsequently, on May 16, 1957, in executive session, the committee reported the nomination favorably, by a vote of 9 to 1. The nomination was debated on the floor of the Senate on May 23, 1957; the SEC incident was again reviewed. 103 Cong. Rec. 7511–25 (1957). The gist of the criticisms was that it was improper for the executive branch to interfere with the quasi-judicial functions of a regulatory agency, and consequently that Mr. Armstrong as chairman of the SEC acted improperly in consenting to such interference. Senator Saltonstall, in supporting confirmation, stated as follows:

> Another instance in which Mr. Armstrong's actions have been assailed is his request of the advice of the Attorney General respecting the application of the doctrine of executive privilege and the extent to which Mr. Armstrong might testify about his conversation with Governor Adams. The Securities and Exchange Commission exercises quasi-judicial powers, in addition to administrative ones. For many purposes this status has served as the basis for differentiating the SEC and similar regulatory agencies from purely executive agencies of the Government. Without attempting to pass judgment on whether the Chairman of an Agency such as the SEC should seek his legal opinions from the Attorney General, the record will show that Mr. Armstrong sought this counsel in compliance with suggestions and recommendations of the members of the subcommittee before which he was testifying.

*Id*. at 7518. The debate terminated with confirmation, without a record vote having been taken. *Id*. at 7525.

### III. The Office of Legal Counsel Memorandum

Apparently the memorandum which you have asked us to review is that prepared by a member of our staff under date of January 5, 1956.*

This memorandum was prepared as a result of Admiral Strauss's request for the Attorney General's opinion as to whether he was justified in asserting privilege in testifying on the repudiation of the Dixon-Yates contract before the Antitrust and Monopoly Subcommittee in December 1955. At that time he refused to disclose any conversations he may have had with the President or Governor Adams on the subject. We did not give him an opinion as he requested; instead a copy of the memorandum was exhibited to him. It concluded that the restrictions of the President's letter of May 17, 1954, applied to the subject of his interrogation.[7]

The memorandum reviews in considerable detail the constitutional and historical basis for the assertion of privilege by officials in the executive branch with respect to their internal communications. It then makes the following points concerning the applicability of that privilege to communications between Admiral Strauss, as Chairman of the Atomic Energy Commission, and the President or Governor Adams, concerning the Dixon-Yates matter:

> 1. "An examination of the historical precedents and the President's letter concerning the exercise of the executive privilege clearly indicate that the precedents and letter apply to the entire executive branch and function of the Government, and not alone to the ten executive departments."

> 2. The Atomic Energy Commission, the principal functions of which are executive in nature, is for the purpose of the privilege to be deemed a part of the Executive Branch.

> 3. Whether or not the Atomic Energy Commission is technically a part of the executive branch, it is, in the exercise of executive functions, subject to the requirements of non-disclosure imposed by the President's letter. In the Dixon-Yates matter it was exercising an executive function.

---

* Editor's Note: As noted above, this memorandum is collected later in this volume (*Assertion of Executive Privilege by the Chairman of the Atomic Energy Commission*, 1 Op. O.L.C. Supp. 468 (Jan. 5, 1956)).

[7] In March 1957, Admiral Strauss renewed his request for an opinion. By memorandum dated April 11, 1957, this Office recommended that no opinion be given.

## IV. Recent Views of the Executive and Legislative Branches and of the Regulatory Agencies Themselves

In this part of the memorandum we shall summarize views which have been recently expressed by the executive and legislative branches and by the regulatory agencies themselves as to the applicability of the doctrine of executive privilege to the regulatory agencies.

### A. Views Expressed by the Executive Branch

The President's letter, it should be noted, says nothing about regulatory agencies as such. However, we do find an expression of the views of the Executive Branch in the Attorney General's letter to Mr. Armstrong of July 12, 1955. *Quoted in* 1955 Hearing, pt. 1 at 378–79. According to that letter, the nondisclosure principles set forth in the President's letter are applicable to administrative agencies, such as the Securities and Exchange Commission, with regard to (1) internal communications of the agency and (2) communications between the agency and others in the executive branch "with respect to administrative matters, but not as to such communications involving an exercise of the agencies' quasi-judicial functions." *Id.* at 379.

### B. Views Expressed by the Regulatory Agencies

There is considerable material emanating from the agencies themselves, which is found in their replies to question 15 of the questionnaire submitted to them by the Special Subcommittee on Government Information of the House Committee on Government Operations, established in 1955 by the 84th Congress. These replies are contained in Staff of H. Comm. on Government Operations, 84th Cong., *Replies from Federal Agencies to Questionnaire Submitted by the Special Subcommittee on Government Information of the Committee on Government Operations* (Comm. Print Nov. 1, 1955).

Question 15 (to be answered only by "Independent Agencies") reads as follows:

> Please indicate your understanding of the application of the doctrine of executive communications (as grounds for withholding information) to:
>
> (a) Communications within the agency and other internal data.
>
> (b) Communications with other agencies.
>
> (c) Communications with the Executive Office of the President.

*Id.* at 3.

The views of the different agencies show some doubt and difference of opinion. Thus, the Federal Communications Commission ("FCC") stated that whether or not the doctrine of "executive communications" applied depended upon the nature of the agency function involved. It said that, while it was difficult to draw "precise lines between the Commission's quasi-judicial, quasi-legislative, and executive and administrative functions," it considered the following functions executive and administrative in nature: "(a) [p]ersonnel, (b) budgetary, (c) matters relating to the negotiating of treaties and negotiations with foreign governments." *Id.* at 167. It pointed out that it cooperated with the Executive Office of the President and the State Department with respect to negotiation and administration of treaties dealing with communications matters. *Id.*

As to quasi-judicial or adjudicatory functions the FCC stated that the doctrine of executive communications had no application and that any such communication was made a part of the public record. *Id.* at 168. But with respect to its administrative or executive functions, it was of the opinion that

> communications with other Government agencies and with the Executive Offices of the President may be withheld under the doctrine of executive communications. In this connection there is enclosed a copy of the President's letter of May 17, 1954, to the Secretary of Defense to which is attached a copy of a memorandum from the Attorney General to the President.

*Id.* at 168.

The Federal Trade Commission on the other hand stated that, since it was not "strictly" an executive agency (citing *Humphrey's Executor*), the doctrine of executive communications presented no serious problem and that "[t]he present Commission has not withheld any of its own information from Congress on that basis and does not intend to do so," including communications with the Executive Office of the President. *Id.* at 216. But as to earlier policy of the Commission it referred to a 1938 letter from the Commission to the Secretary of the President advising him that it respected the desire of the President against publication of any correspondence referred to "departments and establishments . . . from the White House." *Id.* The Interstate Commerce Commission stated categorically that "[a]s the ICC is an arm of Congress rather than part of the executive establishment, there has been no occasion for the doctrine of executive communications to arise." *Id*. at 303.

The National Labor Relations Board, after noting that it was uncertain as to the meaning of the doctrine of "executive communication," stated that it

> certainly would respect the wishes of another agency or the Executive Office of the President to maintain a confidence when requested or implied. In sum we assume that an "executive communication" in

> terms in which that phrase appears to be used, means a "communication" that is not for release generally.

*Id.* at 351. The Securities and Exchange Commission, apparently reluctant to express itself in detail, merely cited the Attorney General's letter of July 12, 1955, the President's letter of May 17, 1954, and other authorities. *Id*. at 433.[8]

### C. Views Expressed by the Legislative Branch

### 1. Study by the Staff of the Committee on Government Operations

In May 1956, the House Committee on Government Operations (84th Congress) published a study by its staff entitled *The Right of Congress to Obtain Information from the Executive and from other Agencies of the Federal Government* (Comm. Print May 3, 1956). After suggesting the confusion as to the President's control over the independent regulatory commissions, the authors of the study seem to be of the view that with respect to withholding information from the Congress it is not necessary to resolve the question of amenability to presidential direction since a commission can be in no better position than executive agencies which have no such right: "In this regard they are both in the same legal status." *Id.* at 6.[9]

### 2. Report of the House Committee on Government Operations

This report states that

> In the information phases of their activities, the independent agencies must be truly independent from executive pressure.
>
> This independence is implicit in the legislation establishing the agencies and is spelled out in court cases. . . . In their quasi-legislative and quasi-judicial functions, the regulatory agencies need accept no interference from the executive bureaus. Specifically, the Budget Bureau has no authority to veto information or comments on

---

[8] For the replies of the Civil Aeronautics Board, the Federal Power Commission and the Federal Reserve Board, *see id.* at 71, 190–91, 201–02. These agencies expressed no view, stating that the doctrine had never been invoked by them.

[9] As we understand them, the authors assert that under *Humphrey's Executor* it is clear that in discharging quasi-judicial and quasi-legislative functions the regulatory commissions act independently of executive control. While recognizing that in some instances there may be executive control as to administrative functions, this, they say, can be derived only from specific legislative grant. There is no separate discussion of the precise question which is the subject of this paper. However, we would assume that the position of the authors is that the regulatory commissions, no more than an executive department, are entitled to claim a right, even as to conceded executive functions, to withhold communications with the President or his staff.

> legislation transmitted from the independent agencies to Congress, nor does the Bureau have any final control, under the Federal Reports Act, over statistical information the independent agencies might request from private organizations and individuals.

H.R. Rep. No. 84-2947, at 87 (1956). Here the committee seems to follow substantially the views of the staff study, and, like that study, it appears to hold to the position that even as to what might normally be considered purely executive functions the independent regulatory commission cannot deny to Congress disclosure of communications with the President or his staff.

### 3. Study by the Staff of the Special Subcommittee on Legislative Oversight

On October 17, 1957, the Special Subcommittee on Legislative Oversight (of the House Committee on Interstate and Foreign Commerce, 85th Congress) released its staff study on the question of the subcommittee's right of access to the files and records of the Civil Aeronautics Board. *Memorandum of Law: Right of Access by Special Subcommittee on Legislative Oversight to Civil Aeronautics Board Files and Records* (Comm. Print Oct. 17, 1957).[10] Included in the 18 conclusions reached in this study is the conclusion that

> "Executive privilege" is not available to an independent agency like the Civil Aeronautics Board as a possible basis for the withholding of information from the Congress. The Civil Aeronautics Board, as the Supreme Court has recognized, is an independent agency whose members are not subject to the removal power of the President. Such a body cannot in any proper sense be characterized as an arm or eye of the Executive. It is instead an arm of the Congress, wholly responsible to that body.

*Id.* at vi. In the discussion of this conclusion, after denying that there is such a doctrine as "executive privilege," it is asserted principally on the basis of *Humphrey's Executor*, which we discuss in detail below, that in any event, administrative bodies like the Civil Aeronautics Board cannot withhold information from Congress under the claim of executive privilege. *Id.* at 4–8.

The Civil Aeronautics Board has filed with the Subcommittee a memorandum of its General Counsel dated October 16, 1957, in which it is argued, *inter alia*, that the Board "validly may, on behalf of the President and subject to his desires, withhold disclosure as to those matters which fall within the category of executive

---

[10] The memorandum was prepared by the Subcommittee's Chief Counsel and Staff Director, Bernard Schwartz. It is under current analysis and study by this Office.

functions until such time as a determination has been made and communicated to the Board by the executive branch with respect to disclosure" (p. 8).

### 4. Views Expressed at the Hearings Before the Senate Subcommittee on Antitrust and Monopoly and on the Armstrong Nomination

The Subcommittee on Antitrust and Monopoly (consisting of Senators Kefauver, O'Mahoney, and Langer) took the position that except for "purely administrative or housekeeping duties" the SEC was not subject to executive control. Senator Russell, speaking at the hearing on Mr. Armstrong's nomination, seemed to think that the independent status of regulatory agencies made it questionable whether they were even entitled to consult the Attorney General as to applicability of the doctrine of executive privilege. Senator Saltonstall, speaking in support of the nomination, stated that he would not attempt to pass judgment on that question.

## V. Judicial Authorities and Professional Comment

No federal court has passed upon the precise question here involved. The decision most nearly bearing on the question is *Humphrey's Executor*, decided in 1935. *Humphrey's Executor* is usually cited by those who maintain that whatever may be the doctrine of executive privilege it has no application to the independent regulatory agencies of the federal government.

*Humphrey's Executor*, involving the Federal Trade Commission, held that the President could not, in his uncontrolled discretion, remove at his pleasure a member of the Federal Trade Commission before the expiration of his term. As a result it was concluded that a member so removed was entitled to recover on a claim for salary for the balance of his term. After reviewing the Federal Trade Commission Act, its legislative history, and the general purposes of the Act, the Court stated that they

> all combine to demonstrate the Congressional intent to create a body of experts who shall gain experience by length of service—a body which shall be independent of executive authority, *except in its selection*, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government.

295 U.S. at 625–26 (emphasis in original).

Other relevant quotations from the opinion are as follows:

> The commission is to be non-partisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. Its duties are neither political nor executive, but predominantly quasi-judicial and

quasi-legislative. Like the Interstate Commerce Commission, its members are called upon to exercise the trained judgment of a body of experts "appointed by law and informed by experience."

*Id*. at 624 (quoting *Standard Oil Co. v. United States*, 283 U.S. 235, 239 (1931); *Illinois Cent. Ry. Co. v. ICC*, 206 U.S. 441, 454 (1907)).

Such a body cannot in any proper sense be characterized as an arm or an eye of the executive. Its duties are performed without executive leave, and, in the contemplation of the statute, must be free from executive control . . . . To the extent that it exercises any executive function—as distinguished from executive power in the constitutional sense—it does so in the discharge and effectuation of its quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government.

*Id*. at 628.

The authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted . . . .

. . . The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there. . . .

The power of removal here claimed for the President falls within this principle, since its coercive influence threatens the independence of a commission, which is not only wholly disconnected from the executive department, but which, as already fully appears, was created by Congress as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments.

*Id*. at 629–30.[11]

In a later decision it was held that *Humphrey's Executor* did not apply to the removal of a director of the Tennessee Valley Authority. *Morgan v. TVA*, 115 F.2d 990 (6th Cir. 1940), *cert. denied*, 312 U.S. 701 (1941). Said the Court:

It is not to be aligned with the Federal Trade Commission, the Interstate Commerce Commission, or other administrative bodies mainly exercising clearly quasi-legislative or quasi-judicial functions—it is

---

[11] A lower federal court has similarly regarded the National Labor Relations Board. *Precision Castings Co. v. Boland*, 13 F. Supp. 877, 884 (W.D.N.Y. 1936).

predominantly an administrative arm of the executive department. The rule of the Humphrey case does not apply.

*Id.* at 994.[12]

And, in another context, the Supreme Court has recognized that in certain of its functions the Civil Aeronautics Board was not free of executive control. *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948). Thus, with respect to the licensing of overseas air transportation, it was said that Congress had "completely inverted the usual administrative process. Instead of acting independently of executive control, the agency is then subordinated to it." *Id.* at 109.

What then is the full import of *Humphrey's Executor*? Is it to be interpreted as meaning that a regulatory commission established by Congress is so completely independent of the President that the doctrine of executive privilege has no meaning under any circumstances? In our opinion, the answer must be in the negative:

1. It is clear, as the Court itself noted, that where the statute vests in the President the power to appoint the members of the commission, to that extent the agency is not independent of executive authority. Accordingly, we think that even under *Humphrey's Executor* a member of a regulatory commission could validly invoke the doctrine of executive privilege as to conversations with the President or members of his staff concerning appointment of commission members.

---

[12] Acting Attorney General Jackson had previously advised the President that *Humphrey's Executor* did not apply. *Power of the President to Remove Members of the Tennessee Valley Authority from Office*, 39 Op. Att'y Gen. 145 (1938). The Court of Claims has held that even though the War Claims Commission exercises quasi-judicial and quasi-legislative functions, nevertheless the President could remove a member of the commission at his pleasure because Congress had imposed no specific limitation on the President's removal power. *Wiener v. United States*, 142 F. Supp. 910 (Ct. Cl. 1956). The Supreme Court has granted certiorari and the case is now pending for argument. [Editor's Note: The decision of the Court of Claims was reversed by the Supreme Court in *Wiener v. United States*, 357 U.S. 349 (1958).]

Several cases of a peripheral interest may be noted: In *Appeal of SEC*, 226 F.2d 501 (6th Cir. 1955), the court sustained, in a suit between private parties, the validity of a regulation of the commission making confidential its internal investigative reports. The court did not differentiate between regulations issued by executive departments and those issued by administrative agencies. *In re Petition of the Finance Committee of the Legislature of the Virgin Islands*, 242 F.2d 902 (3d Cir. 1957), involved a contest between the Governor of the Virgin Islands and its legislature. A legislative committee was upheld in its claim to examine the records of the Commissioner of Finance as against the contention that the committee's authority had expired. The highest court of Massachusetts has inferentially recognized the existence of the doctrine of executive privilege. In *Opinion of the Justices*, 102 N.E.2d 79 (Mass. 1951), the state senate was advised that it was entitled, as against the claim of a violation of the constitutional doctrine of separation of powers, to inspect a report of the state industrial commission, there not being any question of diplomatic or military secrets. In *Morss v. Forbes*, 132 A.2d 1 (N.J. 1957), the Supreme Court of New Jersey held that a county prosecuting attorney could not assert as against the state legislature the doctrine of executive privilege since under New Jersey law it was not sufficiently clear that he was a part of the executive branch.

2. In *Humphrey's Executor*, the Court dealt with the power of Congress to limit the President's constitutional authority to remove members of the Federal Trade Commission appointed by him. This question was resolved by the Court on an evaluation of the President's control over the exercise of functions vested in the FTC. Where the primary functions of the commission are, like those of the Federal Trade Commission, quasi-legislative and quasi-judicial, and Congress has restricted the President's power of removal, the commission may be, with respect to the exercise of its quasi-legislative and quasi-judicial powers, free of executive control. Hence as to such matters it would seem that the members of the commission may not invoke the doctrine of executive privilege.

But what about an agency which has important executive functions? Professor Robert E. Cushman of Cornell University notes in his work, *The Independent Regulatory Commissions* (1941),[13] that the Interstate Commerce Commission, for example,

> carries on the executive task of enforcing the Safety Appliance Acts, a task certainly not "incidental" to the quasi-judicial job of rate making. The commission is obviously not purely executive in the sense in which the Humphrey opinion uses the term; neither is it purely quasi-legislative and quasi-judicial. This is true of most of the regulatory commissions and this means that their constitutional status was not determined by the Humphrey cases.

*Id.* at 457–58.

For our purposes, a more striking example is the Federal Maritime Board. That board was established by Reorganization Plan 21 of 1950 (15 Fed. Reg. 3178) as an agency within the Department of Commerce. The members of the board are appointed by the President, by and with the advice and consent of the Senate. With respect to its regulatory functions the board is independent of the Secretary of

---

[13] Professor Cushman's book is a comprehensive study of American regulatory commissions. For our purposes, of particular interest is chapter VI, pages 417–78, dealing with the constitutional status of the independent regulatory commissions, and more specifically, pages 448–67, dealing with the relations of the commissions to Congress and the President. Professor Cushman does not discuss the precise question considered in this memorandum. However, the conclusions reached by him on the broader questions of the relationship of the commissions to Congress and the President support the conclusions reached by us in this memorandum. Another study (of little help here) is Wilson Keyser Doyle, *Independent Commissions in the Federal Government* (1939).

None of the commentators who have dealt with the question of executive privilege has, to our knowledge, discussed the matter from the special standpoint of the regulatory agencies. *See, e.g.*, Herman Wolkinson, *Demands of Congressional Committees for Executive Papers*, 10 Fed. B.J. 103 (pt. 1), 223 (pt. 2), 319 (pt. 3) (1949); Note, *Power of the President to Refuse Congressional Demands for Information*, 1 Stan. L. Rev. 256 (1949); Philip R. Collins, *The Power of Congressional Committees of Investigation to Obtain Information from the Executive Branch: The Argument for the Legislative Branch*, 39 Geo. L.J. 563 (1951); Joseph W. Bishop, Jr., *The Executive's Right of Privacy: An Unresolved Constitutional Question*, 66 Yale L.J. 477 (1957).

Commerce. These functions include the regulation and control of rates, service, practices, and agreements of common carriers by water, making rules and regulations affecting shipping in the foreign trade, and investigating discriminatory practices in such trade. They are obviously quasi-legislative and judicial. The board also has important executive functions, including the making of investigations and determinations antecedent to the award of ship construction and ship-operating differential subsidy construction and ship-operating differential subsidy contracts and awarding such contracts. As to these functions it is expressly provided that the board is to be guided by the general policies of the Secretary of Commerce. *Id.* § 106, 15 Fed. Reg. at 3179.

It is obvious that an agency like the Maritime Board cannot be characterized, within the meaning of *Humphrey's Executor*, as independent of executive control or as an agency of the Legislative Branch. In the performance of its executive functions the Maritime Board must consider the policies of the executive branch as expressed by the Secretary of Commerce. Since the President therefore, through the Secretary of Commerce, exercises a supervisory role over the non-regulatory functions of the Maritime Board it is our opinion that communications between the board and the President with respect to such matters are privileged.

Another example, indicated earlier, is the Civil Aeronautics Board, one of whose statutory functions, 49 U.S.C. § 602, is to consult with and assist the State Department in the negotiation of agreements with foreign governments for the establishment or development of air transportation, air navigation, air routes and services. The conduct of foreign relations is constitutionally vested in the President. It is an area in which Presidents have vigorously asserted the right to withhold information from the Congress. It may be assumed *arguendo* that for purposes of removal of its members the Civil Aeronautics Board, like the Federal Trade Commission, is independent of executive control within the meaning of *Humphrey's Executor*. But that independence, which is derived from the board's exercise of quasi-legislative and quasi-judicial functions, cannot, in our opinion, extend to its participation in the negotiation of foreign agreements, a matter constitutionally vested in the President. Accordingly, in our judgment, the board in this respect would be obliged to respect the President's wishes concerning the release of information.

3. In some areas Congress has itself subjected the independent regulatory commissions to executive control. For example, under the Act of August 26, 1950, Pub. L. No. 81-733, § 3, 64 Stat. 476, 477, it has authorized the President to extend to all departments and agencies of the government the authority vested in specified department and agency heads to make summary suspensions and dismissals of their civilian employees in the interest of the national security. *See Cole v. Young*, 351 U.S. 536 (1956). Under Executive Order 10450, the President has extended applications of the provisions of the act to all departments and agencies, and by section 9(c) of the order the President has imposed a confidential status on "reports and other investigative material and information developed by

investigations." 18 Fed. Reg. 2489, 2492 (1950). We do not think that even though a regulatory commission may be characterized as "independent" for certain purposes, it may properly ignore the President's direction as to the confidential status of this material on the theory that it is not subject to presidential control.

4. In some instances Congress has vested in the President the power to remove members of the regulatory commissions for "inefficiency, neglect of duty, or malfeasance in office."[14] On this basis Professor Cushman makes the argument, which we think is a valid one, that the President under penalty of removal "may exact reasonable efficiency and absolute integrity" and

> can force an independent regulatory commission to comply with ex-
> ecutive orders of general application unless Congress clearly indi-
> cates that such orders should not apply. These executive orders relate
> to a multitude of matters which affect the general efficiency of the
> government. . . . [T]he refusal of the commission to obey the Presi-
> dent's executive order would constitute neglect of duty or miscon-
> duct, which would justify the removal of the commissioners from of-
> fice.

*Independent Regulatory Commissions* at 464, 465. It is also to be noted that the President is vested with managerial responsibility over regulatory agencies by the Reorganization Act of 1949, 5 U.S.C. § 133z.

Where the President is vested with general managerial powers over a regulatory commission it would seem proper to regard the doctrine of executive privilege as extending to the disclosure of communications between the commission and the President or his staff concerning managerial matters.

5. As a matter of practice the independent regulatory commissions have never been regarded as so divorced from the executive branch as to preclude them from seeking, with approval of the President, the advice of the Attorney General. Thus, Attorney General Biddle gave such advice for the benefit of the Interstate Commerce Commission (*Extension of Time to Pay Rail Carriers' Freight Charges*, 40 Op. Att'y Gen. 353 (1945)); Attorney General Murphy furnished an opinion for the benefit of the Securities and Exchange Commission concerning the applicability of statutes regulating the transmission of publications free of postage (*Free Mailing of Publications by the Securities and Exchange Commission*, 39 Op. Att'y. Gen. 405 (1940)); and Acting Attorney General Keenan issued an opinion for the benefit of the Maritime Commission concerning the applicability of the civil service laws to appointments of attorneys to its staff (*Applicability of Civil Service Rules to Appointment of Attorneys by United States Maritime Commission*,

---

[14] *See, e.g.*, 15 U.S.C. § 41 (Federal Trade Commission); 42 U.S.C. § 1802 (Atomic Energy Commission); 49 U.S.C. § 11 (Interstate Commerce Commission); 49 U.S.C. § 421 (Civil Aeronautics Board).

39 Op. Att'y. Gen. 50 (1937)). On June 15, 1955, you advised the President, upon submission of a question by the Federal Communications Commission, regarding the scope of statutory prohibitions against the disclosure of certain information (unpublished opinion, File No. 19-2-547).

These instances reflect the thought that at least with respect to matters not involving quasi-legislative or quasi-judicial functions it is appropriate to consider the independent regulatory commissions in administrative matters as part of the executive branch of the federal government. This would seem to be sound not only in legal theory but as a matter of good management.

## VI. Conclusion

We conclude in short that a case cannot be made for absolute exclusion of the so-called independent regulatory agencies from the doctrine of executive privilege. Although free from executive control in the exercise of quasi-legislative and quasi-judicial functions, they frequently exercise important functions executive in nature. As to these they are subject to executive control. From a managerial standpoint they may also be amenable to executive direction. Whatever may be the validity of the argument that the doctrine of executive privilege is inapplicable if attempted to be invoked with respect to the performance of a quasi-legislative or quasi-judicial function, it does not follow that the doctrine is equally irrelevant in relation to the performance of executive and managerial functions. As to the latter we think the doctrine of executive privilege is as much applicable to regulatory commissions as to the executive departments and officers of the government.

W. WILSON WHITE
*Assistant Attorney General*
*Office of Legal Counsel*