Myron **WIENER**
v.
The **UNITED STATES.**
No. 337–54.

United States Court of Claims.
July 12, 1956.

I. H. Wachtel, New York City, for plaintiff.

Walter Kiechel, Jr., Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant, Gerson B. Kramer on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

On June 8, 1950, the plaintiff was appointed a member of the War Claims Commission, to serve during the life of the Commission, which was to expire not later than March 31, 1955. On December 10, 1953, the plaintiff was removed by the President, and another person was appointed in his stead. The plaintiff alleges the President had no authority to remove him, and that he was at all times ready, willing, and able to perform the duties of his office. He sues for the salary he would have earned had he not been removed.

The President's power to remove has been considered by the Supreme Court in two fairly recent leading cases. In Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160, that court set forth the doctrine that the President has the inherent power to discretionarily remove an official or officer appointed by him and confirmed by the Senate, even though the appointment is for a fixed term, and even though the Act creating the office provided for removal for stated causes. However, in Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611, the court, after limiting the broad scope of the Myers case to purely executive officers, held that the President may not at his discretion remove an official who is a member of a quasi-legislative or quasi-judicial agency, when the Act creating the agency fixes a definite term of office and provides for removal for stated causes.

Hence, the first question we must consider is whether the War Claims Commission was a part of the executive branch of the Government. If this question is answered in the affirmative, then under the doctrine of the Myers case, there can be no doubt that the President had the power to discretionarily remove the plaintiff. If, on the other hand, it is determined that the War Claims Commission acted in a quasi-legislative or quasi-judicial capacity, the court must then determine whether the present case falls within the scope of the Humphrey decision.

Did the War Claims Commission exercise power predominantly legislative or judicial in character, or was it a part of the executive branch of the Government? If the latter, the President clearly had the power of removal.

The War Claims Commission was created by the War Claims Act of 1948, 62 Stat. 1240, 50 U.S.C.A.Appendix, § 2001 et seq. Section 5(b) of this Act provided for the adjudication of the claims of American citizens for detention benefits. It reads:

"The Commission is authorized to receive, adjudicate according to law, and provide for the payment of any claim filed by, or on behalf of, any civilian American citizen for detention benefits for any period of time subsequent to December 6, 1941, during which he was held by the Imperial Japanese Government as a prisoner, internee, hostage, or in any other capacity, or remained in hiding to avoid being captured or interned by such Imperial Japanese Government."

Section 6(b) of the Act provided for the adjudication of claims of prisoners of war. It reads:

"The Commission is authorized to receive, adjudicate according to law, and provide for the payment of any claim filed by any prisoner of war for compensation for the violation by the enemy government by which he was held as a prisoner of war, or its agents, of its obligation to furnish him the quantity or quality of food to which he was entitled as a prisoner of war under the terms of the Geneva Convention of July 27, 1929. The compensation allowed to any prisoner of war under the provisions of this subsection shall be at the rate of $1 for each day he was held as a prisoner of war on which the enemy government or its agents failed to furnish him such quantity or quality of food. * * *"

Section 7 provided for the adjudication of claims by religious organizations. It reads:

"The Commission is authorized to receive, adjudicate according to law, and provide for the payment of any claim filed by any religious organization functioning in the Philippine Islands and affiliated with a religious organization in the United States, or by the personnel of any such Philippine organization, for reimbursement of expenditures incurred, or for payment of the fair value of supplies used, by such organization or such personnel for the purpose of furnishing shelter, food, clothing, hospitalization, medicines and medical services, and other relief in the Philippines to members of the armed forces of the United States or to civilian American citizens (as defined in section 5) [section 2004 of 50 USC Appendix] at any time subsequent to December 6, 1941, and before August 15, 1945. * * *"

Section 11 gave the claimant the right to a hearing of his claim and made the decision of the Commission "final and conclusive on all questions of law and fact and not subject to review *by any other official* of the United States or *by any court by mandamus or otherwise * *.*" (Italics supplied.)

By Section 2(d), 64 Stat. 449, the Commission was given the power to issue subpoenas and to administer oaths to witnesses.

All of the foregoing are powers such as are vested in courts of justice. In the performance of such duties the Commission was acting in a quasi-judicial capacity; or, perhaps, as an agent of Congress in discharge of the congressional obligation "to pay the Debts of the United States." Certainly in so doing it was not performing an executive function.

It is true that such powers are from time to time conferred on executive agencies, and the exercise of such powers does not make such agencies a part of the judicial branch of the Government. This is because the function of such agencies is primarily executive, and the performance of duties judicial in nature is incidental or ancillary to the discharge of their executive duties. But the War Claims Commission was clothed with no executive powers. The powers conferred on it, to which we have heretofore referred, were wholly judicial, or, perhaps, legislative in character.

Other duties were also put upon the Commission, but they were not of an executive but of a legislative nature.

The claims provided for in the foregoing sections consisted of claims of civilian internees, prisoners of war, or of religious bodies. They were to be paid out of a War Claims Fund, made up of the proceeds of enemy property seized by the Alien Property Custodian. It was recognized that there were many other classes of claims, but no provision was made for their payment. However, in section 8 the Commission was directed to make a survey of these other claims and to report to Congress: (1) on the number and amount of them, classified by types and categories, and (2) the extent to which they might be settled by international

agreement. The Commission was also directed to recommend (1) the types of claims that should be received and considered, supported by a statement as to the legal or equitable basis for their possible allowance, and (2) the method by which these claims should be considered, and the limitation of time that should be fixed for the filing of such claims. The Commission was also directed to draft a bill to be introduced in Congress to carry out its recommendations. There can be no doubt that in discharging this function the Commission acted as an agent of the Congress.

The fact that this report was to be submitted to the President is of no significance. It was to be submitted to him "for submission of such report to the Congress." The President was not requested to comment on the report; his sole function was to transmit it. He was no more than the depository designated to receive the report and to transmit it to the Congress. Presumably it was to be submitted to him only to take care of the eventuality that Congress might have adjourned *sine die* at the time the Commission was ready to report.

Under section 9, the Commission was directed to make a report of its operations *to the Congress*. These reports were to cover the discharge of all the duties cast upon it, to wit, the adjudication of claims, and the survey of other claims the adjudication of which was not provided for, preliminary to a recommendation for their disposition, and such recommendation.

Nowhere in the Act is there cast upon the Commission the discharge of any executive function. All its functions were of a nature either judicial or legislative.

We must next determine whether the removal of a member of such a commission is within the scope of the Humphrey decision.

The Federal Trade Commission Act, which was involved in the Humphrey case, provided that each commissioner appointed to the Federal Trade Commission by the President should continue in office for a definite number of years, but that any commissioner could "be removed by the President for inefficiency, neglect of duty, or malfeasance in office." The President requested Humphrey to resign from his position as commissioner and, when Humphrey refused to do so, the President removed him from office without assigning any cause therefor. Humphrey's executor sued in this court to recover the salary which was lost by reason of the removal. The case was certified by this court to the Supreme Court. That Court determined that the Federal Trade Commission was quasi-legislative and quasi-judicial in nature and not a part of the executive branch of the Government, and held that the President may not within his discretion remove an official of such an agency when the act creating the agency fixes a definite term of office and specifies causes for which the President may remove.

From the following language which appears at the conclusion of the Humphrey opinion, 295 U.S. at page 632, 55 S.Ct. at page 875, it appears that the Supreme Court intended to limit the scope of the Humphrey decision to the precise situation then before it:

"To the extent that, between the decision in the Myers Case, which sustains the unrestrictable power of the President to remove purely executive officers, and our present decision that such power does not extend to an office such as that here involved, there shall remain a field of doubt, we leave such cases as may fall within it for future consideration and determination as they may arise."

The Constitution is silent as to the power of the President to remove officials appointed by him. The voluminous opinions in the Myers case, and in the Humphrey case, give the details of the executive and congressional action, and the decisions of the courts, on this question, throughout our history. The Humphrey decision showed that there had been a change in the attitude of the Supreme Court since the Myers decision. The case which we have to decide is dif-

914

ferent from both Myers and Humphrey. It resembles Humphrey in that the functions of the plaintiff's office were not executive, but quasi-judicial and quasi-legislative. But it differs from Humphrey in the important respect that Congress, in creating the War Claims Commission, did not place any limitation upon the President's power of removal.

If we pass over earlier periods in our history, including the period of conflict between Congress and President Johnson, and limit ourselves to relatively recent history, we find that in 1921, in the enactment of the Budget and Accounting Act, 42 Stat. 23, 31 U.S.C.A. § 43, Congress placed limitations on the President's power to remove the Comptroller General. It provided stated grounds on which he might be removed and then said that he could be removed "for no other cause and in no other manner except by impeachment." In 1926, Congress, in creating the National Mediation Board, 44 Stat. 579, 45 U.S.C.A. § 154, provided that a member of the Board might be "removed by the President for inefficiency, neglect of duty, malfeasance in office, or ineligibility, but for no other cause." In 1935, in the National Labor Relations Act, 49 Stat. 451, 29 U.S.C.A. § 153(a), Congress created a Board whose functions would be largely quasi-judicial, and used substantially the same form of words as in the act creating the National Mediation Board.

In the Act of June 29, 1936, creating the United States Maritime Commission, 49 Stat. 1985, 46 U.S.C.A. § 1111(a), Congress said "Any member may be removed by the President for neglect of duty or malfeasance in office." The Act of June 23, 1938, 52 Stat. 980, 49 U.S.C.A. § 421, creating the Civil Aeronautics Board, used similar language as did also the Act of August 1, 1946, 60 Stat. 756, 42 U.S.C.A. § 1802(a) (2) creating the Atomic Energy Commission.

The Indian Claims Commission Act of August 13, 1946, 60 Stat. 1050, 25 U.S.C.A. § 70b(b) provided that the members of the Commission should hold office during good behavior until the dissolution of the Commission, as thereinafter provided, and could "be removed by the President for cause after notice and opportunity to be heard."

The Act of September 23, 1950, 64 Stat. 997, 50 U.S.C.A. § 791(a) creating the Subversive Activities Control Board again used the careful language, including the words, "but for no other cause" used in the earlier acts creating the office of the Comptroller General, the National Mediation Board, and the National Labor Relations Board.

It seems to us that Congress, having used various forms of language in earlier and later important statutes, might have been expected to use some form of expression indicating its intent, whenever it intended to limit the President's power. But in the statute creating the War Claims Commission, 62 Stat. 1240, 50 U.S.C.A.Appendix, § 2001, Congress did not even use the unclear language which was the subject of litigation in the Humphrey case. It provided in subsection (c) that claims could be filed with the Commission no later than March 31, 1952, and in subsection (e) that the Commission should wind up its affairs no later than three years after the last date for filing claims.

Taking the case in its aspect most favorable to the plaintiff, we have an officer appointed to perform quasi-judicial and quasi-legislative functions, and for a term certain or which can be made certain. If the President had not the unlimited power to remove him, he could not be removed at all except by impeachment, since the statute stated no limited grounds upon which the President might remove him. We do not think that Congress had any such intent. To impose upon itself the obligation to resort to the cumbersome, time-consuming and rarely used method of impeachment would be a serious step indeed. If Congress had intended that the President should not have the unlimited power of removal, it would most certainly have provided him with a limited power which would relieve Congress of the intolerable burden of an impeachment proceeding. Even in the

case of Federal judges, constitutionally assured of tenure during good behavior, there is a recurring search in Congress for the discovery of some method which might be permitted by the Constitution, of removing them for cause without the uncertain and harrowing experience of an impeachment proceeding.

Furthermore, we do not think that the asserted certain term of office, which is all that the plaintiff can find in the statute to rely on, shows an intent that the appointee should be irremovable. In its context, it seems to us to say that the Commission, from the time of its creation, must plan its work so that it will not have unfinished business when the expiration date occurs, because Congress does not intend to extend its life. The language seems to us to have been used, not to protect the members of the Commission in their tenure, but to protect the Treasury and the public against the perpetuation of an agency which was meant to be temporary.

The Supreme Court, in Shurtleff v. United States, 189 U.S. 311, 315, 316, 23 S.Ct. 535, 536, 47 L.Ed. 828, said:

"To take away this power of removal in relation to an inferior office created by statute, although that statute provided for an appointment thereto by the President and confirmation by the Senate, would require very clear and explicit language. It should not be held to be taken away by mere inference or implication. * * * The right of removal would exist if the statute had not contained a word upon the subject. It does not exist by virtue of the grant, but it inheres in the right to appoint, unless limited by constitution or statute. It requires plain language to take it away."

The Supreme Court found in the Humphrey case a Congressional intent, shown by the statutory language and the legislative history, to limit the President's power. That decision no doubt tempered the strict doctrine stated in the Shurtleff case. But it did not discard it to the extent that a court should conclude that the President's power had been abrogated even though there was no evidence at all, or substantially no evidence, that Congress so intended. There is no evidence whatever of any such intent in relation to the statute under construction in the instant case.

Plaintiff's petition is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

The italicized part of the following quotation from the majority opinion points up the difference between my view and theirs:

"The case which we have to decide is different from both Myers and Humphrey. It resembles Humphrey in that the functions of the plaintiff's office were not executive, but quasi-judicial and quasi-legislative. *But it differs from Humphrey in the important respect that Congress, in creating the War Claims Commission, did not place any limitation upon the President's power of removal.*"

The majority says that the President had the power to remove members of the War Claims Commission because Congress did not limit his power of removal; I say he has no power of removal of a quasi-legislative or quasi-judicial officer unless Congress confers this power on him. I say it is not a matter of limiting the President's power, because he did not have such power to begin with. If the power is not conferred by Congress, then the power does not exist.

I think this is the principle underlying the Humphrey decision. In that de-

cision the Supreme Court said that the President could not remove a member of the Federal Trade Commission except for such cause as was specified by Congress, but in the Myers decision they had said that the President's power to remove a person in the executive department could not be limited by Congress. In other words, as to an executive officer, the power of removal is inherent in the office of President, but as to a quasi-legislative officer, there is no such inherent power, and, hence, the President possesses only such power as Congress confers on him.

There is no other way to harmonize the Myers and Humphrey decisions.

Such a distinction is compelled, I think, by the constitutional concept of the separation of powers between the executive and the legislative and judicial branches of the Government. The Constitution intended that each should be supreme in its own field, subject only to those checks and balances specifically set forth in the Constitution. If the President has the inherent power to remove a member of a body created by Congress to perform a legislative function, then Congress is not supreme in its own field, but is subordinate to the supreme executive power. Likewise, if he has the inherent power to remove a member of a body created to perform a quasi-judicial function, then the judicial branch is not independent, but is subordinate to the will of the executive.

Since the War Claims Commission was a part of the judicial or legislative branch of the Government, or both, the President had no power to remove the members of that Commission unless the power to do so was conferred on him by Congress. The majority does not say Congress conferred the power; it says they failed to withhold it. I say, since Congress did not confer the power, the President did not have the power.

United States Court of Claims.
June 5, 1956.

