WIENER *v.* UNITED STATES.

No. 52.  Argued November 18, 1957.—Decided June 30, 1958.

*I. H. Wachtel* argued the cause and filed a brief for petitioner.

*Solicitor General Rankin* argued the cause for the United States.  With him on the brief were *Assistant Attorney General Doub, Paul A. Sweeney* and *Herman Marcuse.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a suit for back pay, based on petitioner's alleged illegal removal as a member of the War Claims Commission.  The facts are not in dispute.  By the War Claims

Act of 1948, 62 Stat. 1240, Congress established that Commission with "jurisdiction to receive and adjudicate according to law," § 3, claims for compensating internees, prisoners of war, and religious organizations, §§ 5, 6 and 7, who suffered personal injury or property damage at the hands of the enemy in connection with World War II. The Commission was to be composed of three persons, at least two of whom were to be members of the bar, to be appointed by the President, by and with the advice and consent of the Senate. The Commission was to wind up its affairs not later than three years after the expiration of the time for filing claims, originally limited to two years but extended by successive legislation first to March 1, 1951, 63 Stat. 112, and later to March 31, 1952, 65 Stat. 28. This limit on the Commission's life was the mode by which the tenure of the Commissioners was defined, and Congress made no provision for removal of a Commissioner.

Having been duly nominated by President Truman, the petitioner was confirmed on June 2, 1950, and took office on June 8, following. On his refusal to heed a request for his resignation, he was, on December 10, 1953, removed by President Eisenhower in the following terms: "I regard it as in the national interest to complete the administration of the War Claims Act of 1948, as amended, with personnel of my own selection." The following day, the President made recess appointments to the Commission, including petitioner's post. After Congress assembled, the President, on February 15, 1954, sent the names of the new appointees to the Senate. The Senate had not confirmed these nominations when the Commission was abolished, July 1, 1954, by Reorganization Plan No. 1 of 1954, 68 Stat. 1279, issued pursuant to the Reorganization Act of 1949, 63 Stat. 203. Thereupon, petitioner brought this proceeding in the Court of Claims for recovery of his salary as a War Claims Commissioner

from December 10, 1953, the day of his removal by the President, to June 30, 1954, the last day of the Commission's existence. A divided Court of Claims dismissed the petition, 135 Ct. Cl. 827, 142 F. Supp. 910. We brought the case here, 352 U. S. 980, because it presents a variant of the constitutional issue decided in *Humphrey's Executor* v. *United States,* 295 U. S. 602.*

Controversy pertaining to the scope and limits of the President's power of removal fills a thick chapter of our political and judicial history. The long stretches of its history, beginning with the very first Congress, with early echoes in the Reports of this Court, were laboriously traversed in *Myers* v. *United States,* 272 U. S. 52, and need not be retraced. President Roosevelt's reliance upon the pronouncements of the Court in that case in removing a member of the Federal Trade Commission on the ground that "the aims and purposes of the Administration with respect to the work of the Commission can be carried out most effectively with personnel of my own selection" reflected contemporaneous professional opinion regarding the significance of the *Myers* decision. Speaking through a Chief Justice who himself had been President, the Court did not restrict itself to the immediate issue before it, the President's inherent power to remove a postmaster, obviously an executive official. As of set purpose and not by way of parenthetic casualness, the

---

*An earlier *quo warranto* proceeding initiated by petitioner was dismissed; an appeal from this judgment was dismissed as moot by stipulation of the parties. The Government's contention that that judgment estops petitioner from relitigating certain issues in the present proceeding does not, in the special circumstances presented on this record, call for consideration on the merits. It was not urged, as in the particular situation it should have been, as a "ground why the cause should not be reviewed by this court." Rule 24 (1) of the Revised Rules of the Supreme Court of the United States. In thus disposing of the matter, we do not mean to imply any support on the merits of the Government's claim.

Court announced that the President had inherent constitutional power of removal also of officials who have "duties of a quasi-judicial character . . . whose decisions after hearing affect interests of individuals, the discharge of which the President can not in a particular case properly influence or control." *Myers* v. *United States, supra,* at 135. This view of presidential power was deemed to flow from his "constitutional duty of seeing that the laws be faithfully executed." *Ibid.*

The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove officials, no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure. The versatility of circumstances often mocks a natural desire for definitiveness. Within less than ten years a unanimous Court, in *Humphrey's Executor* v. *United States,* 295 U. S. 602, narrowly confined the scope of the *Myers* decision to include only "all purely executive officers." 295 U. S., at 628. The Court explicitly "disapproved" the expressions in *Myers* supporting the President's inherent constitutional power to remove members of quasi-judicial bodies. 295 U. S., at 626–627. Congress had given members of the Federal Trade Commission a seven-year term and also provided for the removal of a Commissioner by the President for inefficiency, neglect of duty or malfeasance in office. In the present case, Congress provided for a tenure defined by the relatively short period of time during which the War Claims Commission was to operate—that is, it was to wind up not later than three years after the expiration of the time for filing of claims. But nothing was said in the Act about removal.

This is another instance in which the most appropriate legal significance must be drawn from congressional failure of explicitness. Necessarily this is a problem in prob-

abilities. We start with one certainty. The problem of the President's power to remove members of agencies entrusted with duties of the kind with which the War Claims Commission was charged was within the lively knowledge of Congress. Few contests between Congress and the President have so recurringly had the attention of Congress as that pertaining to the power of removal. Not the least significant aspect of the *Myers* case is that on the Court's special invitation Senator George Wharton Pepper, of Pennsylvania, presented the position of Congress at the bar of this Court.

Humphrey's case was a *cause célèbre*—and not least in the halls of Congress. And what is the essence of the decision in Humphrey's case? It drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body "to exercise its judgment without the leave or hindrance of any other official or any department of the government," 295 U. S., at 625–626, as to whom a power of removal exists only if Congress may fairly be said to have conferred it. This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference. "For it is quite evident," again to quote *Humphrey's Executor,* "that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." 295 U. S., at 629.

Thus, the most reliable factor for drawing an inference regarding the President's power of removal in our case is the nature of the function that Congress vested in the War Claims Commission. What were the duties that Congress confided to this Commission? And can the inference fairly be drawn from the failure of Congress to

provide for removal that these Commissioners were to remain in office at the will of the President? For such is the assertion of power on which petitioner's removal must rest. The ground of President Eisenhower's removal of petitioner was precisely the same as President Roosevelt's removal of Humphrey. Both Presidents desired to have Commissioners, one on the Federal Trade Commission, the other on the War Claims Commission, "of my own selection." They wanted these Commissioners to be their men. The terms of removal in the two cases are identic and express the assumption that the agencies of which the two Commissioners were members were subject in the discharge of their duties to the control of the Executive. An analysis of the Federal Trade Commission Act left this Court in no doubt that such was not the conception of Congress in creating the Federal Trade Commission. The terms of the War Claims Act of 1948 leave no doubt that such was not the conception of Congress regarding the War Claims Commission.

The history of this legislation emphatically underlines this fact. The short of it is that the origin of the Act was a bill, H. R. 4044, 80th Cong., 1st Sess., passed by the House that placed the administration of a very limited class of claims by Americans against Japan in the hands of the Federal Security Administrator and provided for a Commission to inquire into and report upon other types of claims. See H. R. Rep. No. 976, 80th Cong., 1st Sess. The Federal Security Administrator was indubitably an arm of the President. When the House bill reached the Senate, it struck out all but the enacting clause, rewrote the bill, and established a Commission with "jurisdiction to receive and adjudicate according to law" three classes of claims, as defined by §§ 5, 6 and 7. The Commission was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination "not subject to

review by any other official of the United States or by any court by mandamus or otherwise," § 11. Awards were to be paid out of a War Claims Fund in the hands of the Secretary of the Treasury, whereby such claims were given even more assured collectability than adheres to judgments rendered in the Court of Claims. See S. Rep. No. 1742, 80th Cong., 2d Sess. With minor amendment, see H. R. Conf. Rep. No. 2439, 80th Cong., 2d Sess. 10–11, this Senate bill became law.

When Congress has for distribution among American claimants funds derived from foreign sources, it may proceed in different ways. Congress may appropriate directly; it may utilize the Executive; it may resort to the adjudicatory process. See *La Abra Silver Mining Co.* v. *United States,* 175 U. S. 423. For Congress itself to have made appropriations for the claims with which it dealt under the War Claims Act was not practical in view of the large number of claimants and the diversity in the specific circumstances giving rise to the claims. The House bill in effect put the distribution of the narrow class of claims that it acknowledged into Executive hands, by vesting the procedure in the Federal Security Administrator. The final form of the legislation, as we have seen, left the widened range of claims to be determined by adjudication. Congress could, of course, have given jurisdiction over these claims to the District Courts or to the Court of Claims. The fact that it chose to establish a Commission to "adjudicate according to law" the classes of claims defined in the statute did not alter the intrinsic judicial character of the task with which the Commission was charged. The claims were to be "adjudicated according to law," that is, on the merits of each claim, supported by evidence and governing legal considerations, by a body that was "entirely free from the control or coercive influence, direct or indirect," *Humphrey's Executor* v. *United States, supra,* 295 U. S., at 629, of

either the Executive or the Congress. If, as one must take for granted, the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, *a fortiori* must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

For such is this case. We have not a removal for cause involving the rectitude of a member of an adjudicatory body, nor even a suspensory removal until the Senate could act upon it by confirming the appointment of a new Commissioner or otherwise dealing with the matter. Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of *Humphrey's Executor,* in its explicit language as well as its implications, precludes such a claim.

The judgment is

*Reversed.*