# Authority of the President to Reassign the Chairmanship of the Federal Power Commission

The President has the power to remove the commissioner now serving as Chairman of the Federal Power Commission and reassign the chairmanship to another commissioner, and if the matter were to be litigated by the commissioner following his involuntary removal from chairmanship, the President's power to remove him would probably, but not certainly, be sustained.

May 11, 1961

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL[*]

A question has arisen concerning the power of the President to designate a new Chairman of the Federal Power Commission prior to the expiration of the term of the commissioner now exercising that function under a designation by President Eisenhower. The problem is current: On January 26, 1961, it was announced that Mr. James C. Swidler of Tennessee would be designated by the President as the new Chairman of the Commission. Because the law pertaining to the designation of the Chairman is somewhat ambiguous, there is ground for the proposition that the incumbent Chairman cannot be removed by the President until his term as a member ends. For the incumbent Chairman, Jerome K. Kuykendall, this will not occur until June 22, 1962. According to press reports, Mr. Kuykendall's associates say that he has no intention of resigning. If he takes the position that the President cannot remove him from the chairmanship, the administration will be faced with an embarrassing impasse arising out of the January 26th announcement that Mr. Swidler is to be Chairman. If Mr. Kuykendall is removed, the matter might be forced into litigation.

Mr. Kuykendall's remedies, in the event of his removal by the President are: (1) to sue in the five-judge court of claims under 28 U.S.C. § 1491 for the $500 additional salary allowed to the Chairman of the Federal Power Commission;[1] or (2) to test his successor's right to office as Chairman by a suit against him in the District Court for the District of Columbia in the nature of *quo warranto*. This action is specifically authorized by District of Columbia Code sections 16-1601 through 16-1611, and may be maintained by a private person directly interested in the federal office involved. *Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915); *see Wiener v. United States*, 357 U.S. 349, 351 n.* (1958). A suit for reinstatement in the district court against the removing authority, the form

---

[*] Editor's Note: This opinion for the Attorney General addresses the same issue as the opinion for the Assistant Special Counsel to the President, rendered three months earlier and also included in this volume (*Authority of the President to Designate Another Member as Chairman of the Federal Power Commission*, 1 Op. O.L.C. Supp. 206 (Feb. 28, 1961)).

[1] While Chairman, a commissioner's compensation is $500 more per annum than he would otherwise receive. Pub. L. No. 84-854, §§ 105(7), 106(45), 70 Stat. 736, 737–38 (1956) (codified at 5 U.S.C. §§ 2204(7), 2205(45) (1958)).

normally used to test the legality of dismissals of subordinate employees of the government under the civil service laws, would not be available to Mr. Kuykendall because the President is not subject to suit in personam testing the legality of his official actions. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866).

In the event that Mr. Kuykendall pursues either of the remedies available to him, there is some risk that a decision adverse to the President which might be entered by a lower court will not be accepted for review by the Supreme Court. Mr. Kuykendall's term expires in 14 months. Because the question is confined to the Federal Power Commission alone, and because prospective difficulties can be clarified by a new reorganization plan for the Federal Power Commission, the Supreme Court may not consider the matter sufficiently important to review on certiorari.[2]

I have reviewed the relevant statutes and legal materials bearing on this problem and conclude: (1) substantial arguments can be made for both sides of the question; but (2) if the matter were to be litigated by Mr. Kuykendall following his involuntary removal from chairmanship, the President's power to remove him would probably, but not certainly, be sustained. The qualification I have stated is necessary because the laws pertaining to the Federal Power Commission chairmanship are sufficiently ambiguous to subject litigation of the question to definite risks for both sides.

## I.

The Office of the Chairman of the Federal Power Commission was created and defined by the Federal Water Power Act of 1930, which provided:

> That a commission is hereby created and established, to be known as the Federal Power Commission (hereinafter referred to as the "commission") which shall be composed of five commissioners who shall be appointed by the President, by and with the advice and consent of the Senate, one of whom shall be designated by the President as chairman and shall be the principal executive officer of the commission: *Provided*, That after the expiration of the original term of the commissioner so designated as chairman by the President, chairmen shall be elected by the commission itself, each chairman when so elected to act as such until the expiration of his term office.

Pub. L. No. 71-412, 46 Stat. 797, 797.

---

[2] If Mr. Kuykendall sues in the district court (from which appeal can be taken to the Court of Appeals for the District of Columbia Circuit) his action for relief *quo warranto* would become moot when his term as a member expires. It is most likely therefore that he will sue in the Court of Claims for the extra salary due him.

This language indicates that the Chairman is simply a commissioner who, in addition to his responsibilities as a voting member of the Commission performing adjudicatory and quasi-legislative functions, also performs executive and administrative functions as principal executive officer of the agency. The designation of a new Chairman therefore merely constitutes a reassignment of those executive and administrative functions. The former Chairman continues to act as a commissioner performing the same adjudicatory and quasi-legislative functions as any other commissioner.

In 1949, as a result of studies undertaken by a task force of the Commission on Reorganization of the Executive Branch of the Government, commonly known as the Hoover Commission, President Truman forwarded to the Congress, under the provisions of the Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 (codified at 5 U.S.C. §§ 133z *et seq.* (1958)), certain changes in the manner of selecting and in the executive role of the chairmen of four independent regulatory commissions, including the Federal Power Commission. *Reorganization Plans Nos. 1 to 13 of 1950*, H.R. Doc. No. 81-504 (1950). The changes pertaining to the latter were set forth in Reorganization Plan No. 9 of 1950, 3 C.F.R. 166 (Supp. 1950), which became effective on May 24, 1950, 64 Stat. 1265. Section 3 of the Plan changed the manner of selection of the Chairman from election by the commissioners to designation by the President:

> *Designation of Chairman.*—The functions of the Commission with respect to choosing a Chairman from among the commissioners composing the Commission are hereby transferred to the President.

A similar provision appeared in the plans submitted for the three other commissions. H.R. Doc. Nos. 81-511, 81-512, 81-514 (1950). As is shown by the history of the plans discussed herein, it was the President's purpose to make uniform his powers with respect to the appointment of the chairmen of such commissions.

The solution to the problem of the President's power to reassign the chairmanship of the Federal Power Commission turns upon the technical effect that section 3 of Reorganization Plan 9 had upon the provisions of the Federal Water Power Act of 1930, quoted above. One view is that section 3 did not affect the Chairman's term because it made no reference to it; the other, which I set out in detail herein, is that no specific grant of a power of removal was necessary once designation of the Chairman had been vested in the President.

In considering the technical effect of section 3, it should be noted that Dean Landis, in his *Report on Regulatory Agencies to the President-Elect*, viewed the law as being so ambiguous that a new reorganization plan for the Federal Power Commission was necessary "making clear that the tenure of its Chairman is at the pleasure of the President." Staff of S. Comm. on the Judiciary, 86th Cong., *Report on Regulatory Agencies to the President-Elect* 85 (Comm. Print 1960) (recommendation 3). In discussing presidential control of chairmanships, Dean Landis

observed that "[t]he situation with respect to the Federal Power Commission is somewhat confused in this respect due to a palpable error in the drafting of the reorganization plan covering that agency." *Id.* at 31. These comments would undoubtedly be used to support Mr. Kuykendall's position in litigation.

In considering this problem a clear distinction must be drawn between the issue at hand—the President's power to control the term of the incumbent of an office which is purely executive and administrative—and the entirely distinct question of the President's power to remove from office as commissioners members of a tribunal performing quasi-judicial and quasi-legislative functions. The chairmanship of the Federal Power Commission does not carry with it any increased powers insofar as concerns the latter: the Chairman, like his fellow commissioners, has only one vote on matters which must be considered by the Commission in its regulatory capacity. The chairmanship is simply an additional assignment to a commissioner of duties and responsibilities of an executive nature. Cases concerning the term of office *as commissioner* of a commissioner of an independent agency performing regulatory functions, therefore, may be put aside. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349 (1958); *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935). The question at hand is concerned only with the intent of the President and the Congress in changing the manner of designating the Commission's executive head, as that intent was manifested and made effective by Reorganization Plan 9.

The purpose of changing the mode of selecting the Chairman from election by the commission to designation by the President was explained in President Truman's message transmitting Reorganization Plans 1 to 13 of 1950 to the Congress:

> In the plans relative to four commissions—the Interstate Commerce Commission, the Federal Trade Commission, the Federal Power Commission, and the Securities and Exchange Commission—the function of designating the Chairman is transferred to the President. The President by law now designates the Chairmen of the other three regulatory commissions covered by these plans. The designation of all Chairmen by the President follows out the general concept of the Commission on Organization for providing clearer lines of management responsibility in the executive branch. The plans are aimed at achieving more fully these management objectives and are not intended to affect the independent exercise of the commissions' regulatory functions.

H.R. Doc. No. 81-504, at 5.

Under section 6(a) of the Reorganization Act of 1949, a reorganization plan proposed by the President becomes effective sixty days of continuous session after it is submitted to the Congress, unless either house passes a resolution stating that

that house does not favor the plan. 63 Stat. at 205 (codified at 5 U.S.C. § 133z-4(a)). Legislative inaction constitutes acquiescence.

No objection to Plan 9 was raised in the House of Representatives. But because of concern that designation of the Chairman by the President might derogate from the independence of the Federal Power Commission, as well as for other reasons, a resolution was introduced in the Senate stating that the Senate was not in favor of that plan. S. Res. 255, 81st Cong. (1950).

Hearings on Senate Resolution 255 and similar resolutions for other plans were conducted by the Senate Committee on Expenditures in the Executive Departments. *Reorganization Plans Nos. 7, 8, 9, and 11 of 1950: Hearings on S. Res. 253, 254, 255, and 256 Before the S. Comm. on Expenditures in the Executive Departments*, 81st Cong. (1950) ("Reorganization Hearings"). At the hearings, Budget Director Frederick J. Lawton explained:

> The plans affecting the Interstate Commerce Commission, the Federal Trade Commission, and the Federal Power Commission provide that the President shall designate a Commissioner to serve as Chairman. These provisions will vest uniformly in the President the function of designating Commission Chairmen. At present he already designates the Chairmen in the Federal Communications Commission, the National Labor Relations Board, and the Civil Aeronautics Board. The Commission on Organization itself took no position on this issue, pro or con. The task force of the Commission, which reported on the regulatory commissions, however, recommended:

> The Chairman of each Commission should be designated by the President.

> In support of this proposal the task force stated:

> This will facilitate communication between the President and the Commission on matters of mutual concern and assist in coordination with the rest of the Government without impairing the independence of the Commission. It will also promote more effective internal administration of the Commission.

> Since the President now designates some Chairmen and does not designate others, and since Presidential designation has these advantages pointed out by the task force, these plans authorize Presidential designation of Chairmen in all cases.

*Id.* at 30–31.

The task force referred to by Mr. Lawton was the Hoover Commission's Committee on Independent Regulatory Commissions, whose report had been transmitted to the Congress on January 13, 1949. *Task Force Report on Regulatory Commissions [Appendix N], Prepared for the Commission on Organization of the Executive Branch of the Government* (Jan. 1949). This report, after a complete survey of the independent regulatory commissions, had recommended that the Chairman of each commission should be designated from among the members by the President and should serve as Chairman at his pleasure, although protected against removal as a member. The purpose of this recommendation was, first, to facilitate communication between the President and the Commission by having each commission headed by the member most acceptable to the President; and second, to strengthen the Chairman's role as administrative head of the agency by conferring presidential support upon him, thereby improving the internal administration of the commission. *Id.* at 31–33.

The members of the Federal Power Commission did not appear as witnesses in the hearings. On behalf of the Commission, however, its Chairman submitted to the committee a brief statement favoring Reorganization Plan 9. Reorganization Hearings at 214–15. Mr. Thomas C. Buchanan, a member of the Commission, submitted a separate statement, in which he took the position that the provision in the plan for presidential designation of the Chairman did not affect the Chairman's term. He stated:

> The provision for the selection of the Chairman by the President changes only the method of "choosing" and does not affect the term of the Chairman so selected under existing law.
>
> The term of a Federal Power Commissioner is presently 5 years, therefore, a President in the fourth year of his term might select as Chairman the member of the Commission nominated by him and confirmed by the Senate during that year. Under the terms of plan 9 as applied to the old law, the Chairman so selected would serve as such not only during the fourth year of the Presidential term in which he was appointed, but likewise 4 years of the succeeding term even though there may be a change in the Presidential office.

*Id.* at 215–16.

The Senate Committee, in reporting against the resolution of disapproval, did not refer to this testimony. It recommended that Plan 9 be permitted to go into effect. S. Rep. No. 81-1563 (1950). In debates on the floor of the Senate, Senator Edwin C. Johnson of Colorado, who opposed presidential designation of the chairmen of independent regulatory commissions, quoted, in the course of his remarks, Commissioner Buchanan's statement about the term of the Chairman's office. 96 Cong. Rec. 7381 (1950). The matter was not otherwise discussed, however, and the debate turned to other aspects of the plan. The resolution of

disapproval was defeated, thereby permitting Reorganization Plan 9 of 1950 to become effective. 96 Cong. Rec. 7383 (1950).

That Commission Buchanan's opinion was quoted on the floor of the Senate by an opponent of Reorganization Plan 9 is not of significance in determining the meaning and effect of the plan. There is nothing in the legislative history to indicate that either the committee or the Senate considered Commissioner Buchanan's view to be correct. Moreover, the legislative history of plans proposed under the Reorganization Act of 1949 cannot be read as evidencing the kind of legislative intent associated with the enactment of statutes. Under the Act, it is the President who promulgates reorganization plans. Congress cannot change the wording or the effect of his plans. It must either reject each plan totally by a resolution of disapproval or acquiesce by silence. Unless a plan is disapproved, therefore, the Congress must be deemed to have acquiesced in the President's intent in promulgating it.

As noted above, substantially the same language was used in section 3 of Reorganization Plans 7, 8, 9, and 10 (H.R. Doc. Nos. 81-511, 81-512, 81-513, and 81-514) to confer on the President authority to designate the Chairmen of the Interstate Commerce Commission ("ICC"), Federal Power Commission, Federal Trade Commission, and Securities and Exchange Commission. Although the plan for the ICC was disapproved by Senate Resolution 253, 81st Cong., 96 Cong. Rec. 7173, the plans for the other three commissions, including the provisions in each plan's section 3, became effective. Reorg. Plan No. 8 (64 Stat. 1264–65), No. 9 (64 Stat. 1265), No. 10 (64 Stat. 1265–66). Further, Budget Director Lawton's testimony quoted above reflects that the President's powers were to be uniform with respect to the chairmanship of all four of the commissions to be affected. The intent of Reorganization Plan 9 is therefore clear.

The foregoing history demonstrates that it was the purpose of the President, in proposing section 3 of that plan, and the intent of the Congress in acquiescing therein, that the Chairman, as chief administrative and executive officer of the Commission, should be acceptable to the incumbent President. This intent was implemented by the provisions of section 3 as is shown by a reading of the plain language of the section and the statute it affected.

I do not find that the failure of Reorganization Plan 9 to mention the term of the Chairman as specified in the Federal Water Power Act of 1930 resulted in a technical defect which prevented the plan from accomplishing its manifest purpose. The term of the Chairman, as specified in the 1930 Act, was merely an incident of the method of selection; the provision fixing that term therefore fell when that method was abandoned.

Since the Chairman was to be elected, he had to be chosen for some specified period; in this instance, the Congress determined that this period should be the term of membership of the commissioner elected as Chairman. The term, however, was made expressly contingent upon the mode of selection, because the statute, in

providing that the Chairman should "be elected by the commission itself," provided in the clause immediately following: "each chairman *when so elected* to act as such until the expiration of his term of office." Pub. L. No. 71-412, 46 Stat. at 797 (emphasis added). The term of the Commissioner elected to act as Chairman, therefore, was contingent solely upon the manner in which he was chosen—i.e., election. When the manner of selection was changed from election by the commission to presidential designation, the qualifying clause defining the Chairman's term became a nullity.

If this analysis is sound, and I believe it is, then Commissioner Buchanan's view is erroneous not only as a matter of the general intent of section 3, but also with regard to its technical effect. Assuming section 3 did not modify the provisions of the 1930 Act fixing the term of the Chairman, those provisions continue to apply to an elected Chairman; therefore the result envisaged by Commissioner Buchanan cannot follow. A commissioner designated as Chairman by the President under Plan 9 is not "elected" under the language of the 1930 Act; since he was not elected, such a Chairman cannot rely on the 1930 definition of his term to sustain his continued incumbency.

The editors of the United States Code have apparently taken the view that section 3 of Reorganization Plan 9 modified the language of the 1930 Act limiting the Chairman's term, even though it made no express reference to it. As published in the Code, the law reads:

> A commission is created and established, to be known as the Federal Power Commission (hereinafter referred to as the "commission") which shall be composed of five commissioners who shall be appointed by the President, by and with the advice and consent of the Senate, one of whom shall be designated by the President as chairman and shall be the principal executive officer of the commission. Each chairman, when so designated, shall act as such until the expiration of his term of office.

16 U.S.C. § 792 (1958). But if the view be accepted that the language of section 3 modified the language in the 1930 Act defining the Chairman's term, I see no reason why that effect should be confined to substituting "when so designated" for "when so elected." If the 1930 Act was changed at all it was changed for accomplishing the whole intent of the Plan; the change adopted by the editors of the Code is not provided by either the language or the purpose of the Plan.

## II.

Even if it should be assumed, contrary to the conclusion reached above, that the provisions of the Federal Water Power Act limiting the term of the chairmanship subsist under Reorganization Plan 9, it can be argued that the President neverthe-

less retains power to reassign that executive and administrative function to another commissioner prior to the expiration of the current Chairman's term as a member of the Commission. It is a well-established rule that when the Congress sets forth a limitation to the term of an executive or administrative post, but vests in the President the power to designate the incumbent of that post, the President acquires, as an incident of the power to appoint, the power to remove a designee prior to the expiration of his term. *Parsons v. United States*, 167 U.S. 324 (1897); *Myers v. United States*, 272 U.S. 52 (1926); *Morgan v. TVA*, 115 F.2d 990 (6th Cir. 1940), *cert. denied*, 312 U.S. 701 (1941). Therefore, when the function of designating the Chairman was conferred upon the President by section 3 of Reorganization Plan 9, it was unnecessary to add any language to the plan expressly reserving to him power to reassign the chairmanship prior to expiration of the term limited in the Water Power Act. "The provision for a removal from office at pleasure was not necessary for the exercise of that power by the President, because of the fact that he was then regarded as being clothed with such power in any event." *Parsons*, 167 U.S. at 339; *see Myers*, 272 U.S. at 164. The executive functions[3] of the Chairman of the Federal Power Commission, like those of the United States Attorney in *Parsons* and the postmaster in *Myers*, are to be performed by the President's designee; and, as in those cases, the law presumes that the designee will perform those functions for the specified term, unless sooner removed by the President.

It is open to us to argue that any other interpretation with respect to the power of the President to relieve a presidential appointee from the performance of purely executive functions prior to the expiration of a statutory term would raise serious constitutional questions. *Myers*, 272 U.S. 52; *see Wallace v. United States*, 257 U.S. 541, 545 (1922); *United States v. Perkins*, 116 U.S. 483, 484 (1886).

Whether the "executive function" contention set forth above can be sustained in litigation is not clear. While it is true that the functions of the Chairman are "executive" in the sense that he is the Commission's chief manager, those functions can be analogized to the administrative role of a chief judge. Under such a view, the "executive" functions are purely incidental and subsidiary to the performance of the Commission's regulatory role. Relying on the rationale of *Wiener*, Mr. Kuykendall could contend that in establishing the Commission as an independent regulatory agency, and giving its Chairman a fixed term, Congress put him beyond the pale of executive control; the independence of the commissioner designated as Chairman, under this view, cannot be compromised by the threat of presidential removal except as expressly provided by law.

It is possible to answer this by showing that, in its non-regulatory functions, the Federal Power Commission is not independent of executive control. Its budget

---

[3] As noted above, the commissioner who is relieved by the President of the executive and administrative functions of the chairmanship continues to exercise the independent regulatory functions of a commissioner.

must be submitted through the President (31 U.S.C. §§ 11, 16 (1958)); internal management surveys may be required by the Bureau of the Budget under 31 U.S.C. § 18 (1958) (*see* General Government Matters Appropriation Act, 1961, Pub. L. No. 86-642, 74 Stat. 473, 475 (1960)); and Dean Landis has pointed out that even proposed legislation to be submitted by the independent agencies must be cleared through the Bureau of the Budget. *Report on Regulatory Agencies to the President-Elect* at 31. Moreover, the Commission's subordinate employees are subject to the Civil Service laws and regulations (16 U.S.C. § 793 (1958)), which are promulgated by the President under the Civil Service Act (5 U.S.C. § 631 (1958); *see* Exec. Order No. 10577, 3 C.F.R. 218 (1954–1958), 19 Fed. Reg. 7521 (1954)). Apart from these express statutory powers, the President has some measure of responsibility for the regulatory agencies under his constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. While the theory of the independent regulatory commission requires that its administration of the regulatory laws should be independent of executive control, the laws administered by the Chairman in his executive capacity are not regulatory at all— they are substantially the same as those administered by the head of any department or office. The chairmanship, therefore, is not an office which is independent in the way that the office of commissioner is independent. The threat of presidential removal does not compromise the chairmanship of the Federal Power Commission any more than it compromises the chairmanships of the other regulatory agencies.

### III.

For the foregoing reasons I conclude that the President has power to remove Mr. Kuykendall from the chairmanship of the Commission, and to reassign the chairmanship to another commissioner. But in arriving at this conclusion, it should be noted that Mr. Kuykendall can find respectable support for the contrary proposition. He would rely upon Commissioner Buchanan's statement, the comment in Dean Landis's report, and the interpretation of the effect of Reorganization Plan 9 by the editors of the U.S. Code. The latter, under 1 U.S.C. § 204(a) (1958), is prime facie, but not conclusive, evidence of the law. Therefore, the question is not entirely free from doubt, and it may well be preferable to seek a legislative solution under the current reorganization plan proposals rather than run the risks of litigation.

NICHOLAS deB. KATZENBACH
*Assistant Attorney General*
*Office of Legal Counsel*
