# Presidential Authority to Require the Resignations of Members of the Civil Rights Commission

Members of the Civil Rights Commission serve at the pleasure of the President. The President may therefore require their resignations.

November 20, 1972

MEMORANDUM OPINION FOR THE SPECIAL CONSULTANT
TO THE PRESIDENT[*]

This is in response to your request for our opinion whether the President is authorized to require the resignations of members of the United States Commission on Civil Rights. Stated another way, the question is whether these officials serve at the pleasure of the President. For the reasons detailed below, we conclude that Civil Rights Commission members do serve at the pleasure of the President.

## I.

The basic rule governing presidentially-appointed officials was stated by James Madison during the first session of the first Congress: "[T]he power of removal result[s] by a natural implication from the power of appoint[ing]." 1 Annals of Cong. 496 (1789). The principal problems in this area concern whether and to what extent Congress may limit the power of removal which flows from the power of appointment. *Myers v. United States* established that Congress may not limit the power of the President to remove purely executive officers appointed with the advice and consent of the Senate, such as cabinet officers. 272 U.S. 52 (1926). On the other hand, Congress can, for example, limit the President's power to remove members of independent regulatory commissions and specially constituted tribunals. *Humphrey's Executor v. United States*, 295 U.S. 602 (1935); *Wiener v. United States*, 357 U.S. 349 (1958). The principal theory underlying this congressional authority is that such bodies may need to function independently of executive control in their legislative and adjudicative capacities. The Civil Rights Commission, primarily an investigative and advisory body, does not fall clearly into either of these categories. For purposes of this discussion, however, we will

---

[*] Editor's Note: The memorandum was addressed to "the Honorable Leonard Garment, Special Consultant to the President." The reference to Mr. Garment as "Special Consultant," not "Special Counsel," appears to have been accurate and deliberate. Mr. Garment was described in multiple news articles at the time as a "special consultant" to the President on civil rights and cultural issues. *See, e.g.*, *Ex-Law Partner to Join Nixon*, Wash. Post, June 7, 1969, at A4; Carroll Kilpatrick, *Leonard Garment Is Bright, Musical, a Known New York Liberal and a Man Close to Richard Nixon*, Wash. Post, June 7, 1970, at 17. In 1973, Mr. Garment succeeded John Dean as Counsel to the President. Lawrence Meyer, *New Counsel Had Obscure Role at Top*, Wash. Post, May 1, 1973, at A8.

assume that Congress could have insulated its members from removal at the pleasure of the President. The question, then, is whether it has done so.

The statutory descriptions governing the appointment and duties of commissioners are the starting point of analysis. 42 U.S.C. § 1975 (1970). With respect to appointment, commissioners do not serve for a fixed term, and there is no statutory provision governing removal. By contrast, members of independent regulatory bodies usually serve for a fixed term of years, and some may only be removed for "cause" or other specified reason. While neither of these factors is dispositive, absent other strong reasons pointing toward independent tenure, the natural implication to be drawn is that Civil Rights Commission members serve at the President's pleasure.

Perhaps the strongest case for limiting the President's removal power is presented by a body created to adjudicate the rights of private parties. The Civil Rights Commission has no such authority, and this has been established by Supreme Court decision. In *Hannah v. Larche*, certain state officials sought to enjoin a Civil Rights Commission hearing in Louisiana concerning discriminatory voter registration practices on the ground that, as prospective witnesses, they were entitled to a panoply of procedural protections denied by the Commission's rules, including the right to confront and cross-examine other witnesses. 363 U.S. 420 (1960). The Court sustained the Commission's rules, saying that

> As is apparent from this brief sketch of the statutory duties imposed upon the Commission, its function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative or executive action.

*Id.* at 440–41.

There are other indicia of executive control over the Commission. The statute establishes it "in the executive branch of the Government." 42 U.S.C. § 1975(a). Although, standing alone, this phrase has no special significance, it is significant that many of the regulatory commissions whose members clearly do not serve at the President's pleasure—for example, the Federal Trade Commission, the Securities and Exchange Commission, and the Federal Communications Commission—are not similarly established "in the executive branch." The President designates the Chairman and the Vice Chairman. 42 U.S.C. § 1975(c). Employees of the federal government, including, presumably, employees clearly subject to the President's control, are eligible to serve as members. 42 U.S.C. § 1975b(b) (1970).

The staff director, a full-time employee responsible for day-to-day operations, is appointed by the President following consultation with the Commission, and subject to Senate confirmation. 42 U.S.C. § 1975d(a) (1970). The Commission's budget requests are subject to OMB approval.

The legislative history of the Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634, which originally established the Commission, does not speak directly to the matter of the President's removal power. However, an amendment offered by Senator Kefauver in floor debate, and defeated, lends some support to our conclusion. The Kefauver amendment would have established the Commission as an arm of Congress, with most of its members appointed by Congress. 103 Cong. Rec. 13,456 (1957). In support of his amendment, Senator Kefauver argued that such a commission would be more independent than one in the Executive Branch, and warned against the "dangerous degree of Executive control" he foresaw in the Commission as it was later established. *Id.* at 13,458. Senators Javits, Dirksen and Knowland spoke against the Kefauver amendment, urging establishment of an "executive commission," and the amendment was defeated by voice vote. *Id.* at 13,459.

A further argument in support of the President's removal power with respect to members of the Civil Rights Commission rests upon the absence of a stated term of appointment. While this omission may have had its origin in the temporary status of the Commission, its tenure has been extended six times by the Congress and it has had a life of fifteen years. It should not be presumed that Congress intended that members of the Commission would serve indefinitely without any possibility—other than death or voluntary resignation—for change in the membership of the Commission. Lifetime appointments are confined to the judiciary in our political systems and it would be anomalous to view persons exercising purely advisory functions as having permanent status.

## II.

In support of an argument that members of the Commission do not serve at the President's pleasure, the following points could be made.

First, among its other statutory duties, the Commission is directed to "appraise the laws and policies of the Federal Government with respect to denials of equal protection of the laws." 42 U.S.C. 1975c(a)(3) (1970). Independent tenure would tend to promote the discharge of that duty.

Second, the Commission is directed to submit reports to both the President and Congress. 42 U.S.C. § 1975c(b). This joint accountability feature may be said to derogate from broad executive control.

Third, unlike most of the independent regulatory commissions in which the President may name a majority of his own party as vacancies arise, the Commission is strictly bipartisan—it has six members, and no more than three may be of the same party. 42 U.S.C. § 1975(b).

Fourth, the Commission has always been a temporary agency. It was originally established for two years, Pub. L. No. 85-315, § 104, 71 Stat. at 635, and has since been extended six times for additional temporary periods, Pub. L. No. 86-383, tit. IV, 73 Stat. 717, 724 (1959); Pub. L. No. 87-264, tit. IV, 75 Stat. 545, 559 (1961); Pub. L. No. 88-152, § 2, 77 Stat. 271, 271 (1963); Pub. L. No. 88-352, § 504(b), 78 Stat. 241, 251 (1964); Pub. L. No. 90-198, § 1, 81 Stat. 582, 582 (1967); Pub. L. No. 92-496, § 4, 86 Stat. 813, 814 (1972). It can be argued, then, that Congress intended for members to serve for the relatively short life of the Commission.

Although each of these points is valid, we do not find them persuasive against the contrary arguments, either singly or in combination. Moreover, most of these points can be answered to some extent. As to the first, as a matter of history, the Commission has in fact been a vigorous critic of administration civil rights policies, Republican and Democratic, through much of its history. As to the second, the requirement of reporting to Congress was added in Senate floor discussion without debate or any indication that the requirement affected the Commission's status in the Executive Branch. 103 Cong. Rec. 13,456 (1957). Moreover, executive officers or agencies are quite frequently required by statute to report to Congress as well as the President. As to the third—bipartisanship—there is no strong answer, but we consider it a relatively minor point. As to the fourth, the Commission, as noted above, has become a more or less permanent agency. Father Theodore M. Hesburgh, for example, served for fifteen years, from the Commission's inception. Although this argument may have had force a decade ago, we do not view it as very substantial now.

Last year, Father Hesburgh wrote an article entitled *Integer Vitae: Independence of the United States Commission on Civil Rights*, 46 Notre Dame Law. 445 (1971), in which he discussed, among other things, the President's removal power vis-à-vis the Commission. He noted several of the arguments discussed in this memorandum, concluding that "the legality of a [presidential] demand for resignation remains in question." *Id.* at 454. Reportedly, Father Hesburgh has now conceded the legality of such a demand. *See* Spencer Rich, *Nixon Confers with Cabinet Aides on Reorganization*, Wash. Post, Nov. 18, 1972, at A15 ("What I did say was that if I were asked to resign by the reelected President, as is his privilege, I would. He did, and I did resign.") (quoting Father Hesburgh). In his article, Father Hesburgh quotes a 1964 letter to the other commissioners from Solicitor General Erwin Griswold, then a commissioner, in which Griswold stated that removal at the pleasure of the President was not, in his view, "either the legal or factual situation." 46 Notre Dame Law. at 454. Apparently, however, the Solicitor General's expressed view was not accompanied by legal argument.

The Hesburgh article also includes a review of the practice of Civil Rights Commissioners with regard to submission of resignations to a new or reelected President. Resignations were tendered in 1961, in November 1963, and again in 1964. *Id.* at 454. In 1968, four commissioners did not tender their resignations, and

two did so for personal reasons. *Id.* On balance, then, the rather brief historical practice favors the President's authority to require resignations.

### III.

In conclusion, while there are no directly controlling judicial precedents, we believe that the arguments clearly weigh in favor of the view that members of the Civil Rights Commission serve at the pleasure of the President.

ROGER C. CRAMTON
*Assistant Attorney General*
*Office of Legal Counsel*