(Slip Opinion)

# Constitutionality of the Commissioner of Social Security's Tenure Protection

The President may remove the Commissioner of Social Security at will notwithstanding the statutory limitation on removal in 42 U.S.C. § 902(a)(3).

The conclusion that the removal restriction is constitutionally unenforceable does not affect the validity of the remainder of the statute.

July 8, 2021

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

You have asked about the scope of the President's constitutional authority to remove the Commissioner of the Social Security Administration ("SSA"), who by statute may be removed only for neglect of duty or malfeasance in office. *See* 42 U.S.C. § 902(a)(3). At the time Congress enacted the Commissioner's statutory protection from removal, this Office observed that the removal restriction presented a serious constitutional question, although we did not resolve whether the removal restriction was in fact unconstitutional. *See* Letter for Lloyd N. Cutler, Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (July 29, 1994) ("1994 Dellinger Letter").

In *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Supreme Court recently concluded that a provision requiring "cause" for the removal of the Director of the Federal Housing Finance Agency ("FHFA") is unconstitutional. That case followed *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), in which the Court held unconstitutional a similar statutory tenure protection conferred on the Director of the Consumer Financial Protection Bureau ("CFPB"). We think the best reading of *Collins* and *Seila Law* leads to the conclusion that, notwithstanding the statutory limitation on removal, the President can remove the SSA Commissioner at will.

## I.

The Social Security Administration administers the Old-Age and Survivors Insurance, Social Security Disability Insurance, Supplemental Security Income, and Special Benefits for Certain World War II Veterans

1

benefits programs. *See, e.g.*, 42 U.S.C. §§ 901(b), 902(a)(4); *see generally* Scott D. Szymendera, Cong. Research Serv., R41716, *Social Security Administration (SSA): Budget Issues* at 1 (Sept. 8, 2014) ("*SSA Budget Issues*"). The agency pays benefits of over a trillion dollars each year, and its activities "touch the lives of nearly every American family and are key components of the nation's economic safety net for the aged and disabled." *SSA Budget Issues* at 1; SSA, *Fact Sheet: Social Security*, https://www.ssa.gov/news/press/factsheets/basicfact-alt.pdf (last visited July 7, 2021).

For the first four years of its existence, the social security system was administered by a three-member, freestanding Social Security Board, whose members were appointed by the President by and with the advice and consent of the Senate and had no express tenure protection. *See* Social Security Act, § 701, Pub. L. No. 74-271, 49 Stat. 620, 635–36 (1935). From 1939 until 1994, the entity that administered the social security system was housed within another agency, subject to the agency head's direction and control, and the agency head did not have tenure protection. In 1939, Congress placed the Social Security Board within the Federal Security Agency, a now-defunct agency that supervised several government benefits programs. *See* Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; Reorganization Plan No. 1 of 1939, § 202, 3 C.F.R. 1288, 1290 (1943 Cum. Supp.). In 1946, acting pursuant to statutory authority, President Truman abolished the Board and transferred its functions to the Federal Security Administrator. *See* Reorganization Plan No. 2 of 1946, § 4, 3 C.F.R. 192, 192 (1946 Supp.). In 1953, President Eisenhower established within the Department of Health, Education, and Welfare (later renamed the Department of Health and Human Services ("HHS")), "a Commissioner of Social Security who shall be appointed by the President by and with the advice and consent of the Senate," who "shall perform such functions concerning social security and public welfare as the Secretary may prescribe." Reorganization Plan No. 1 of 1953, § 4, 3 C.F.R. 131, 132 (1953).

In the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464 ("the Act"), Congress changed the status of the entity by then known as the Social Security Administration from a component within HHS to an "independent agency in the executive branch of the Government." *Id.* sec. 101, § 701(a) (codified at 42 U.S.C. § 901(a)). Under the Act, the SSA Commissioner is "appointed

for a term of 6 years," "may continue in office until the entry upon office of . . . a successor," and "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* sec. 102, § 702(a)(3) (codified at 42 U.S.C. § 902(a)(3)). The Commissioner now leads the SSA as a single-member head, similar to the Directors of the CFPB and the FHFA whose removal restrictions the Court found unconstitutional in *Seila Law* and *Collins*, respectively.

Congress enacted the current structure of the SSA, including the protection from removal conferred on the Commissioner, in response to concerns about a high turnover among political appointees that affected the agency's performance as well as "policy errors resulting from inappropriate influence from outside the agency." H.R. Rep. No. 103-670, at 89–90 (1994) (Conf. Rep.).[1] As reflected in the conference report to the Act, the 1994 changes—the shift from sub-agency to agency status, coupled with the Commissioner's new term and tenure protections—were intended to promote "management efficiency" and to ensure fidelity to the agency's statutory mission. *Id.*

When signing the Social Security Independence and Program Improvements Act of 1994 into law, President Clinton commended the organizational changes as "elevating the stature of the agency" and important to "maintain[ing] the confidence of all Americans in the Social Security program." Statement on Signing the Social Security Independence and Program Improvements Act of 1994 (Aug. 15, 1994), 2 Pub. Papers of Pres. William J. Clinton 1471, 1471 (1994). He nonetheless noted that, in the opinion of the Department of Justice, the relative rarity of a single-member, tenure-protected agency head "raises a significant constitutional question," and that he was "prepared to work with the Congress on a corrective amendment that would resolve the constitutional question so as to eliminate the risk of litigation." *Id.* at 1472.

President Clinton's signing statement was consistent with advice that this Office had provided about the Act. We explained that the Commis-

---

[1] *Cf.* H.R. Rep. No. 103-221, at 4–5 (1994) (committee report for similar bill) ("Over the past twenty years, SSA has been plagued by a lack of stability and continuity in its executive leadership. . . . By establishing a fixed term of office for the Commissioner, . . . the Committee bill enhances the likelihood that SSA will attract and retain first-rate leadership" that will "lead to the development of far sighted policies and administrative practices.").

sioner's "removal restriction presents a more serious constitutional question than restrictions on the President's ability to remove the members of multi-person boards that govern the more traditional independent regulatory agencies, and it would severely erode the President's authority in a vitally important area of national concern." 1994 Dellinger Letter at 1. We further observed that the SSA's new structure as an agency led by a single person with tenure protection was "extraordinary." *Id.* We distinguished an analysis we had offered on an earlier version of the legislation, which would have provided for a three-person independent SSA board. That structure, we thought, would have been permissible because "the President generally will have some input on the make-up of the governing body" in the case of "an agency headed by a multi-member body whose members may only be removed for cause," whereas the single Commissioner's six-year term created "a strong possibility that a President will never have a say in the conduct of an agency that affects the lives of every American every day." Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Michael Small, Office of Legal Counsel, *Re: Social Security Administration Independence Act* at 4 (July 29, 1994) (attached to 1994 Dellinger Letter); *see also* Memorandum for Harriet Rabb, General Counsel, Department of Health and Human Services, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Restructuring of Social Security Administration* at 4 (June 2, 1994).

We did not definitively conclude that the Commissioner's removal restriction that Congress eventually enacted was unconstitutional, but recommended that the provision be eliminated or revised to avoid "plac[ing] the proper administration of our social security system at risk." 1994 Dellinger Letter at 2.

## II.

As this Office has explained, "[t]he first great constitutional debate in the First Congress concerned the power to remove officers of the United States"—and that debate has continued ever since. *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 166 (1996) ("*Separation of Powers*"). The Constitution makes no reference to the removal of executive officers, aside from impeachment. U.S. Const. art. II, § 4. Moreover, the Constitution expressly grants Con-

gress authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or any Department or Officer thereof." *Id*. art. I, § 8, cl. 18. The Necessary and Proper Clause grants Congress broad authority to create the positions that executive officers occupy and to structure those offices as Congress believes best to achieve its goals. And Congress has wielded this authority throughout the Nation's history by enacting legislation—signed by the President—that provides removal protection to an array of executive officers. *See Seila Law*, 140 S. Ct. at 2224–25, 2229–33 (Kagan, J., dissenting); *see also Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) (upholding removal restrictions for the Federal Trade Commission ("FTC")).

On the other hand, the Constitution vests the executive power and other specific authorities in a President on whom it imposes a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Although the "executive Power" is vested in the President, "the Constitution assumes that lesser executive officers will assist the [President] in discharging the duties of his trust," and that when they do so, those lesser executive officers will "remain accountable to the President." *Seila Law*, 140 S. Ct. at 2197 (internal quotation marks omitted). To meet his "take Care" duty, the President must have some ability to remove executive officers who the President believes are failing to satisfy the constitutional command of faithful execution of the laws. *See also* 1 Annals of Cong. 463 (1789) (statement of James Madison on the floor of the First Congress that "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws"). This removal authority also helps ensure that executive officials remain responsive to the President's supervision.

The constitutional challenge thus posed is how to do justice to both congressional and presidential authority in the removal context. This Office has acknowledged that tension, requiring that the President enjoy "at will" removal power over those officers whose functions consist of helping the President perform his or her constitutional responsibilities, such as the Secretary of Defense, but accepting removal restrictions in some other contexts. *Separation of Powers*, 20 Op. O.L.C. at 169. We have insisted on a careful contextual assessment of particular removal provisions, focusing on the specific powers an officer wields and the

impact that a removal restriction has on the President's ability to perform his or her constitutional functions. *Id*. at 170. In so doing, we have relied heavily on Supreme Court precedent, in particular the Court's rationale in *Morrison v. Olson* that identified the central constitutional inquiry as being whether a removal restriction would "impede the President's ability to perform his constitutional duty." 487 U.S. 654, 691 (1988). More recent Supreme Court decisions have extended the Court's precedents in ways that shift the balance in favor of presidential authority. For the reasons given below, we think the best reading of those recent decisions leads to the conclusion that the President has the constitutional authority to remove the SSA Commissioner at will.

## A.

Since the Office initially flagged constitutional concerns about the Commissioner's tenure protection in 1994, the Supreme Court has taken a series of steps limiting statutory restrictions on the President's ability to remove executive officers. Beginning with *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), where the Court declared unconstitutional a removal restriction for the first time in nearly a century, the Court has focused on the potential of such restrictions to "subvert[] the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498; *see also Myers v. United States*, 272 U.S. 52 (1926) (next-most recent decision holding unconstitutional a removal restriction in a statute requiring the Senate's advice and consent prior to the President's removal of postmasters). Even more recently, the Court has issued two decisions addressing the circumstances under which Congress may impose limitations on removal of single-member heads of agencies.

Last year, in *Seila Law*, the Court for the first time considered a statutory tenure protection for a single-member head of an independent agency. *See* 140 S. Ct. 2183. In that decision, the Court found unconstitutional the statutory tenure protection afforded the Director of the CFPB, which provided that "[t]he President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). *Seila Law* began by describing a general rule that "the President possesses 'the authority to remove those who assist him in carrying out his duties.'" 140

S. Ct. at 2198–200 (citation omitted). The Court then stated that it recognized only two exceptions to such unrestricted removal power: one for "multimember bod[ies] of experts, balanced along partisan lines" that "do not wield substantial executive power," and another for "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 2199–200 (discussing *Humphrey's Ex'r*, 295 U.S. 602, and *Morrison*, 487 U.S. 654). The Court found that the CFPB Director fell into neither category, and was "vested with significant executive power" based on the Director's authority to "promulgate binding rules fleshing out 19 federal statutes [concerning] . . . unfair and deceptive practices," to "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications," and to "seek daunting monetary penalties against private parties on behalf of the United States in federal court." *Id.* at 2200–01.

*Seila Law* also declined to sanction removal protection for the CFPB Director because of a lack of historical precedent for the CFPB's single-Director structure. *Id.* at 2201. The parties had identified "'only a handful of isolated' incidents in which Congress has provided good-cause tenure to principal officers who wield power alone rather than as members of a board or commission," including the heads of the Office of Special Counsel, the SSA, and the FHFA. *Id.* (citation omitted). The Court determined that these "modern and contested" examples, which did "not involve regulatory or enforcement authority remotely comparable to that exercised by the CFPB," did not provide adequate historical precedent to justify the CFPB Director's protection from removal as a single-member agency head. *Id.* at 2202.

Finally, *Seila Law* held that the CFPB's single-Director structure failed to subject the agency to sufficient "ongoing supervision and control [by] the elected President." *Id.* at 2203. According to the Court, "[t]he CFPB's single-Director structure . . . vest[ed] significant governmental power in the hands of a single individual accountable to no one," because the Director was "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is." *Id.* That problem was exacerbated by the fact that several other features of the CFPB "foreclose[d] certain indirect methods of Presidential control." *Id.* at 2204. In particular, the CFPB Director's five-year term meant that "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities." *Id.* The Court also thought that the CFPB's re-

ceipt of funds outside the appropriations process might allow the agency to slip further from the President's control. *Id.*

Accordingly, the Court concluded that the statutory restriction on the President's authority to remove the Director was unconstitutional and that the President could remove that officer at will. *Id.* at 2201, 2211. The Court expressly left open the question whether removal restrictions for the heads of similarly structured agencies, including the SSA, were unconstitutional as well. *Id.* at 2202.

The Court's reasoning in *Seila Law* was open to debate. President Obama did not object to the CFPB Director's tenure protection when signing the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") into law. *See* Press Release, Office of the Press Secretary, The White House, Remarks by the President at Signing of Dodd-Frank Wall Street Reform and Consumer Protection Act (July 21, 2010). And four justices in *Seila Law* dissented strongly, arguing that the majority opinion was at odds with constitutional text, history, the Court's precedents, and "the need for sound and adaptable governance." 140 S. Ct. at 2226 (Kagan, J., dissenting); *see also id*. at 2236 ("[C]aselaw joins text and history in establishing the general permissibility of for-cause provisions giving some independence to agencies."). In the dissent's view, the majority's claimed general rule of presidential removal power "does not exist." *Id.* at 2225. The dissenting justices rejected the claim that the removal protection for the CFPB Director was novel, noting that the "CFPB wields the same kind of power as the FTC" and its head "receive[s] the same kind of removal protection," such that the Director's tenure protection should be constitutional under *Humphrey's Executor*. *Id*. at 2238. The dissent criticized the majority's single-head distinction, insisting that examples of single-headed independent agencies were not as rare as the majority claimed and that, if anything, multi-member commissions are harder for the President to control. *Id.* at 2241–42. Most fundamentally, the dissent criticized the Court for unjustifiably restricting Congress's constitutional power to shape administrative bodies to meet pressing needs and for deviating from the Court's longstanding pattern of leaving "most decisions about how to structure the Executive Branch to Congress and the President, acting through legislation." *Id*. at 2224, 2236–38.

After *Seila Law*, there remained a number of ways to potentially distinguish the CFPB Director from the SSA Commissioner that could have

been relevant to the constitutional analysis. As observed in *Seila Law* itself, the SSA's "role is largely limited to adjudicating claims for Social Security benefits." *Id.* at 2202 (majority opinion). Because adjudication is a primary function of the SSA, the SSA Commissioner arguably is more like the Commissioners of the Federal Trade Commission, for whom the Court upheld tenure protection in *Humphrey's Executor*, 295 U.S. 602.[2] The Court also previously emphasized the distinctiveness of adjudicatory authority in inferring a constitutionally permissible removal protection for the members of the War Claims Commission in *Wiener v. United States*, 357 U.S. 349, 356 (1958).

Last month, however, the Court issued its decision in *Collins*, which concluded that "[a] straightforward application" of *Seila Law* meant that the FHFA Director's statutory protection from removal by the President except "for cause" was unconstitutional. 141 S. Ct. at 1784. The Court found no dispositive distinctions between the FHFA and the CFPB. Although the Court recognized the agencies' difference in scope, it found that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." *Id.* Furthermore, both agencies exercised authority in ways that could have a direct or indirect "impact on millions of private individuals and the economy at large." *Id.* at 1785–86. Nor was the Court persuaded that the FHFA took on the status of a private party, as opposed to an executive entity, when it acted as a conservator or receiver. *Id.* at 1785.

*Collins* narrows the arguments available to meaningfully distinguish the SSA Commissioner's statutory removal protection from the provision found unconstitutional in *Seila Law*. To be sure, *Collins* "d[id] not comment on the constitutionality of any removal restriction that applies" to the SSA Commissioner, *see id.* at 1787 n.21, and therefore cannot be said to definitively resolve the question. It did, however, minimize the import of the distinctions *Seila Law* had drawn between the CFPB and other

---

[2] *See Seila Law*, 140 S. Ct. at 2199 (noting that *Humphrey's Executor* "acknowledged that between purely executive officers on the one hand, and officers that closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left 'for future consideration'" (citation omitted)). *But see id.* (explaining that the Court in *Morrison* had "[b]ack[ed] away from the reliance in *Humphrey's Executor* on the concepts of 'quasi-legislative' and 'quasi-judicial' power," viewing "the ultimate question as whether a removal restriction is of 'such a nature that [it] impede[s] the President's ability to perform his constitutional duty'" (citation omitted)).

similarly structured agencies. *Id.* at 1784; *see also id.* at 1802 (Kagan, J., concurring) ("The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block.").[3] Indeed, the principal criticism in Justice Kagan's concurrence in *Collins* was that the majority opinion had abandoned *Seila Law*'s inquiry into whether a single-director agency wielded "significant executive power." *Id.* at 1800–01; *accord id.* at 1805 (Sotomayor, J., dissenting) (focusing on the FHFA's lack of significant executive power).

## B.

In light of the Court's reasoning in *Collins* and *Seila Law*, we have reexamined the constitutional concerns that we previously raised about the SSA Commissioner's protection from removal when Congress enacted the provision in 1994. We believe that the best reading of those decisions compels the conclusion that the statutory restriction on removing the Commissioner is unconstitutional. Therefore, the President may remove the Commissioner at will. We emphasize that both of these recent decisions leave open the possibility that certain agencies, including (and perhaps especially) some that conduct adjudications, may constitutionally be led by officials protected from at-will removal by the President. But we think that under *Collins* and *Seila Law*, the combination of features of the SSA—a single Commissioner whose term extends longer than the President's, the immense scope of the agency's programs, the Commissioner's broad power to affect beneficiaries and the public fisc, and the SSA's largely unparalleled structure—means that the President need not heed the Commissioner's statutory tenure protection in 42 U.S.C. § 902(a)(3).

First, *Seila Law* reasoned that a single-headed structure and lengthy tenure raise particular constitutional concerns. Although the Court has

---

[3] In addition, the government stated in its reply brief in *Collins* that, "under the government's reading of *Seila Law*, the President must have the power to remove at will the single heads of the Social Security Administration and Office of Special Counsel, both of whom likewise exercise 'significant executive power.'" Reply and Response Brief for the Federal Parties at 26, *Collins*, Nos. 19-422, 19-563 (U.S. Oct. 2020). As discussed below, this opinion does not address the validity of tenure protections conferred on the Special Counsel, whose removal restrictions implicate different considerations, or the head of any other agency that does not share the SSA's specific combination of features.

upheld removal restrictions for an agency exercising adjudicative functions when the agency was headed by a body composed of multiple members, *see Humphrey's Ex'r*, 295 U.S. at 628; *accord Wiener*, 357 U.S. at 350,[4] the Court in *Seila Law* distinguished the CFPB Director in part based on the Director's position as the agency's sole head. 140 S. Ct. at 2201. So, too, the SSA Commissioner has the ultimate statutory responsibility for adjudication of claims under the SSA's benefits programs. *Seila Law* further observed that the CFPB Director's term was five years and, depending on the timing, "an unlucky President might . . . find herself saddled with a holdover Director from a competing political party." *Id.* at 2204. The Commissioner's six-year term raises the same issue. Here, in fact, the incumbent Commissioner was appointed in 2019 to a term that will not expire until January 19, 2025, the day before the end of the President's current term. *See* PN94—Andrew M. Saul—Social Security Administration, 116th Cong. (2019), https://www.congress.gov/nomination/116th-congress/94. Insulating the SSA Commissioner from removal would thus impair the President's ability to shape the policies of the SSA across the entirety of the term for which he was elected.

Second, the vast size and importance of the SSA's programs distinguish it from many other agencies and adjudicatory contexts. Social Security "is one of the federal government's largest programs." Barry F. Huston, Cong. Research Serv., IF10426, *Social Security Overview* at 1 (updated May 7, 2020). "Today, about 178 million people work and pay Social Security taxes and about 64 million people receive monthly Social Security benefits." SSA, *Support*, https://www.ssa.gov/agency/pillars/support.html (last visited July 7, 2021). Initially aimed at "ensur[ing] the financial security of members of the workforce when they reach old age," *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 898 (2019), over time Social Security has also become a central mechanism for providing financial support to the disabled and to families of deceased workers. *See* Barry F. Huston, Cong. Research Serv., R42035, *Social Security Primer* at 1–2 (updated May 15, 2020). Under the Commissioner's supervision, the SSA reviews over 650,000 claims filed under the Social Security Act every year—

---

[4] *See also Collins*, 141 S. Ct. at 1783 n.18 (noting that the Court in *Wiener* had reasoned that "the War Claims Commission was an adjudicatory body, and as such, it had a unique need for 'absolute freedom from Executive interference'" (quoting *Wiener*, 357 U.S. at 353)).

adjudication on a vast and unique scale. *See* SSA, *Hearings and Appeals*, https://www.ssa.gov/appeals/about_us.html (last visited July 7, 2021). The financial impact of Social Security is equally massive. In 2019, the social security system collected $1,062 billion in taxes and paid $1,059 billion in benefits, while the social security trust funds held $2.9 trillion in assets in 2020. *See Social Security Overview* at 1. It is difficult to overstate the agency's significant footprint on daily American life. *See Collins*, 141 S. Ct. at 1785 (emphasizing that "FHFA actions . . . could have an immediate impact on millions of private individuals and the economy at large").

Third, the Commissioner not only oversees the adjudication of claims for social security benefits, but also administers and sets policy for the agency's extensive benefits programs, and can impose monetary penalties in certain situations.[5] *See Seila Law*, 140 S. Ct. at 2201 (noting the importance of a single Director exercising "significant executive power"); *see also Restructuring of Social Security Administration* at 4 ("[A] significant amount of the [SSA's] work is devoted to adjudicating disputed social security claims," but "the SSA performs other functions, such as administering the Social Security system, that can be categorized as executive functions."). *But see Collins*, 141 S. Ct. at 1783–84 (appearing to dispense with or diminish the importance of the "significant executive power" inquiry). The Commissioner manages the SSA's massive benefits programs and oversees an agency that employs almost sixty-thousand government workers.[6] Moreover, the Commissioner makes certifications and determinations with respect to program-related trust funds and is one

---

[5] Indeed, this management role likely occupies more of the Commissioner's time than adjudication. Although the governing regulations authorize the Commissioner to review certain adjudicative decisions, *see, e.g.*, 20 C.F.R. § 498.222(a), the agency's adjudicatory functions are largely performed by designees of the Commissioner, including Administrative Law Judges and members of the Appeals Council, *see, e.g., id.* §§ 404.983, 416.1483.

[6] *See* 42 U.S.C. §§ 901(b) ("It shall be the duty of the Administration to administer the old-age, survivors, and disability insurance program."), 902(a)(4) ("The Commissioner shall be responsible for the exercise of all powers and the discharge of all duties of the Administration, and shall have authority and control over all personnel and activities thereof."); *see also id.* §§ 902(a)(6) (providing the Commissioner organizational control over the SSA), 902(a)(7) (authorizing the Commissioner to assign duties), 904(a) (describing the Commissioner's hiring and budgetary authorities); SSA, *Organizational Structure of the Social Security Administration*, https://www.ssa.gov/org (last visited July 7, 2021).

of the members of those funds' board of trustees. 42 U.S.C. § 401. To be sure, the Commissioner does not exercise enforcement authority comparable in scale to the CFPB Director. But the SSA does have statutory authority to impose money sanctions on claimants who make false or misleading statements when applying for disability benefits. *See id.* § 1320a-8. Under that authority, the SSA has imposed significant civil penalties against individuals. *See, e.g.*, *Valent v. Comm'r of Soc. Sec.*, 918 F.3d 516, 517 (6th Cir. 2019) (civil penalty of $75,000).

The Commissioner also has substantial authority to issue regulations governing the distribution of benefits, including some discretion to issue regulations reflecting his or her own policy preferences.[7] The Supreme Court has described this rulemaking authority as "'exceptionally broad.'" *Bowen v. Yuckert*, 482 U.S. 137, 145 (1987) (citation omitted) (upholding a regulation promulgated pursuant to 42 U.S.C. § 405(a), which at the time vested authority in the Secretary of Health and Human Services, that "require[d] disability claimants to make a threshold showing that their 'medically determinable' impairments are severe enough to satisfy the regulatory standards"). And courts have frequently deferred to SSA decisions that reflect the Commissioner's judgment as to how best to understand the federal benefits statutes, as well as how best to administer benefits programs. *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (deferring to the SSA's determination that the agency can find a claimant not disabled when she remains physically and mentally able to do her previous work, without investigating whether that work exists in significant numbers in the national economy); *Barnhart v. Walton*, 535 U.S. 212, 217 (2002) (deferring to an SSA regulation stating that a claimant is not disabled "regardless of [his] medical condition" if the claimant is doing "substantial gainful activity," which the agency subsequently explained meant that "within 12 months after the onset of an impairment . . . the impairment no longer prevents substantial gainful activity" (citations

---

[7] *See* 42 U.S.C. §§ 405(a) ("The Commissioner . . . shall have full power and authority to make rules and regulations and to establish procedures . . . necessary or appropriate to carry out [benefits program] provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same."), 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration.").

omitted)).[8] In short, the sheer scale of the Commissioner's ability to affect beneficiaries and the public fisc counsels against statutory interference with the President's authority to remove such a sole agency head.

Fourth, both *Collins* and *Seila Law* emphasized that the single-director structures at issue in those cases were historical anomalies, *see Collins*, 141 S. Ct. at 1783–84; *Seila Law*, 140 S. Ct. at 2201, and the SSA's structure similarly appears to be without parallel among benefits-adjudicating agencies. As explained in Part I, when the predecessor of the SSA, the Social Security Board, was a freestanding agency during the first four years of the social security program from 1935 to 1939, it was led by a three-member board whose members lacked express tenure protection. And in the 55 years before the 1994 amendments, the head of the agency housing the social security system was always subject to at-will presidential removal.

The Railroad Retirement Board ("RRB") is perhaps the current agency most analogous to the SSA. The RRB administers benefits for railroad workers, who are not part of the social security system. 45 U.S.C. § 231f. Like the former Social Security Board, the RRB is a three-member board of officials appointed by the President and confirmed by the Senate with no express tenure protection. *Id.* § 231f(a). This Office, moreover, has declined to infer such protection for RRB members. *Removal of Holdover Officials Serving on the Federal Housing Finance Board and the Railroad Retirement Board*, 21 Op. O.L.C. 135, 141 (1997) (distinguishing *Wiener*). Most of the other federal benefits adjudication systems are within Executive Departments such as the Department of Labor and the Depart-

---

[8] *See also, e.g.*, *Schafer v. Astrue*, 641 F.3d 49, 50–51, 61 (4th Cir. 2011) (deferring to the SSA's conclusion that "natural children must be able to inherit from the decedent under state intestacy law or satisfy certain exceptions to that requirement in order to count as 'children' under the [Social Security] Act" in part because of the SSA's "extensive experience in administering the Act's survivorship benefits program, as well as the legal and practical ability to respond more quickly to changing regulatory circumstances"); *Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 80 (2d Cir. 2009) (deferring to an SSA policy prohibiting consideration of the combined effects of a child's limitations in different domains of functioning in part because "[t]he SSA has substantial expertise and is charged with administering a complex statute"); *Stroup v. Barnhart*, 327 F.3d 1258, 1260–61 (11th Cir. 2003) (deferring to an SSA regulation defining "eligibility" to mean that the agency "'consider[s] you to first become eligible for a monthly pension in the first month for which you met all requirements for the pension except that you were working or had not yet applied'" (quoting 20 C.F.R. § 404.213(a)(3))).

ment of Veterans Affairs, whose heads are subject to at-will removal by the President. There are other agencies that perform discrete adjudicatory duties, such as the Small Business Administration, which adjudicates grievances arising from various loan and grant programs, *see, e.g.*, 13 C.F.R. § 134.228, and the Office of Personnel Management, which adjudicates claims for federal retirement benefits, *see, e.g.*, 5 C.F.R. § 841.301 *et seq*. But none of those agencies has a single head with express tenure protection. *See, e.g.*, 15 U.S.C. § 633(a) (establishing the office of Administrator of the Small Business Administration); 5 U.S.C. § 1102(a) (establishing the office of Director of the Office of Personnel Management).

In light of this combination of factors and the Supreme Court's recent decisions in *Collins* and *Seila Law*, we conclude that the President may remove the SSA Commissioner at will. We emphasize the limited scope of our conclusion regarding the Commissioner. It does not imply any similar determination with respect to the validity of tenure protections conferred on other executive officials—for example the Special Counsel, another single-member agency head whose removal restrictions implicate different considerations, such as the Special Counsel's primarily investigatory function and "limited jurisdiction," *Seila Law*, 140 S. Ct. at 2202. Nor does our conclusion speak to the constitutionality of existing or hypothetical tenure protections for any other agency heads, including multi-member commissions, that do not share the specific combination of features identified here. *See id.* at 2192, 2198–200, 2206 (determining it unnecessary to revisit *Humphrey's Executor* and distinguishing *Wiener* as involving a multi-member adjudicatory body).

## C.

Although under *Collins* and *Seila Law* the restriction on removal in 42 U.S.C. § 902(a)(3) is unconstitutional, and thus unenforceable, that conclusion does not affect the validity of the remainder of the statute, including the default term length and succession provisions for the Commissioner. "[O]ne provision of a [statute] may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity." *Loeb v. Trs. of Columbia Twp.*, 179 U.S. 472, 490 (1900) (internal quotation marks omitted). What matters is whether the statute's provisions "are so connected, or dependent on each other in subject matter, meaning[,] or purpose, that the good cannot re-

main without the bad." *Id.* (internal quotation marks omitted); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2353 (2020) ("The Court has long applied severability principles in cases like this one, where Congress added an unconstitutional amendment to a prior law."). We think it clear that the SSA Commissioner's removal protection is severable from the remainder of the SSA organic statute, just as the Court in *Seila Law* determined that the removal protection provision for the CFPB Director was severable from the remainder of the Dodd-Frank Act.

The Chief Justice's opinion in *Seila Law* pointed to several factors that made severability of the removal restriction appropriate.[9] That opinion first emphasized that the provisions "bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction." 140 S. Ct. at 2209 (opinion of Roberts, C.J.). The same is true here. If the President disregarded the prescription that the Commissioner "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office," 42 U.S.C. § 902(a)(3), that would not impair the structure or functioning of any other provision of the statute, since none of those provisions depends upon the Commissioner's statutory protection from removal.

Nor is there anything "in the text or history of" the statute that demonstrates that "Congress would have preferred *no* [SSA] to [an SSA] supervised by the President." *Seila Law*, 140 S. Ct. at 2209 (opinion of Roberts, C.J.). On the contrary, for most of the SSA's history, the entity was headed by an individual or individuals who did not enjoy tenure protection. *See, e.g.*, Reorganization Plan No. 1 of 1939, § 202; Reorganization Plan No. 2 of 1946, § 4; Reorganization Plan No. 1 of 1953, § 4. The limitation on the Commissioner's removal only for neglect of duty or malfeasance in office is a relatively recent innovation. *See* Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, sec. 102, § 702(a)(3), 108 Stat. at 1466. It is true that Congress enacted that limitation in part because of its frustration with the SSA's performance and judgment under its prior structure. *See* H.R. Rep. No. 103-670, at 89–90.

---

[9] Only two Justices joined the Chief Justice's severability analysis, but the four dissenting Justices concurred in the judgment with respect to severability, stating that "all those who join this [dissenting] opinion[] believe[] that *if* the agency's removal provision is unconstitutional, it should be severed." *Seila Law*, 140 S. Ct. at 2245 (Kagan, J., dissenting).

But we seriously doubt Congress believed the next-best solution was to dismantle the SSA and the benefits programs it administers altogether. *See Seila Law*, 140 S. Ct. at 2210 (opinion of Roberts, C.J.) (concluding that even though "Congress preferred an independent CFPB to a dependent one," it "would [not] have preferred a dependent CFPB to *no agency at all*"); *Free Enter. Fund*, 561 U.S. at 509 (reasoning that unconstitutional tenure provisions were severable because "[t]he remaining provisions are not 'incapable of functioning independently' and nothing in the statute's text or historical context makes it 'evident' that Congress . . . would have preferred no Board at all to a Board whose members are removable at will" (citation omitted)). Those programs are of critical importance to tens of millions of United States citizens, who often depend on social security benefits for subsistence.

Declaring inoperative other provisions of the 1994 amendments or underlying statute thus would deal "appreciable damage to Congress's work" in the field of federal benefits and could wreak havoc on the individuals who depend on those benefits. *Seila Law*, 140 S. Ct. at 2210 (opinion of Roberts, C.J.). Such an approach would be inconsistent with the Supreme Court's direction that statutes with constitutional flaws be treated modestly whenever possible, "limit[ing] the solution to the problem [and] severing any problematic portions while leaving the remainder intact." *Free Enter. Fund*, 561 U.S. at 508 (internal quotation marks omitted). Regarding the restriction on removal in 42 U.S.C. § 902(a)(3) as constitutionally unenforceable while leaving the remainder of the statute intact respects those principles, as well as Congress's judgments about how the Executive Branch should administer federal benefits, to the maximum extent possible.

## III.

We therefore conclude that the President may remove the SSA Commissioner at will. We further conclude that disregarding the constitutionally unenforceable restriction on removal in 42 U.S.C. § 902(a)(3) would not affect the validity of the remainder of the statute.

DAWN JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*